UNITED STATES U.S. DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
ROMAN DE GABRIEL RIVERA,

        Plaintiff,                                 INDEX NO. 21-CV-06006-KPF-KHP

  -against-

LETTIRE CONSTRUCTION CORP., MOTT CENTER LLC, REDFERN FRP, LLC, PHIPPS HOUSES, ROCKAWAY VILLAGE III HOUSING DEVELOPMENT FUND CORPORATION FRV PHASE 3 LIHTC LLC, and MOOREGROUP CORPORATION,        DECLARATION OF ANGELA LEVITAN

        Defendants.
-------------------------------------------------------- X

      I, ANGELA LEVITAN, declare as follows:

      1.      I am a professional biomechanist and human factors engineer. I have over 25 years of experience in biomechanics, human factors and kinematics, and human injury mechanisms and tolerance.

      2.      I received a Doctor of Philosophy degree in Industrial and Systems Engineering, Human Factors Option, and a Master of Science degree in Industrial and Systems Engineering, with an emphasis in Safety Engineering, from Virginia Polytechnic Institute and State University. I also obtained a Master of Science degree in Mathematics from Virginia Polytechnic Institute and State University, and a Bachelor of Arts in Mathematics from the University of Connecticut. Details of my experience and education are provided in my *curriculum vitae* attached hereto as Exhibit "1." This declaration is based upon my professional knowledge, education, training, experience, and materials regularly relied upon in biomechanics and human factors and kinematics.

3. I have been retained by the law firm of Ropers Majeski, P.C., attorneys for Defendants, LETTIRE CONSTRUCTION CORP. ("Lettire"), MOTT CENTER LLC ("Mott Center"), REDFERN FRP LLC, PHIPPS HOUSES, ROCKAWAY VILLAGE III HOUSING DEVELOPMENT FUND CORPORATION ("Rockaway Village III"), FRV PHASE 3 LIHTC LLC and MOOREGROUP CORPORATION ("Moore Group")(collectively, "Defendants"), in the above-captioned matter. This declaration is submitted in support of Defendants' motion for summary judgment.

4. In reaching the conclusions contained in this declaration, I have reviewed the various pleadings, deposition transcripts, exhibits introduced at the various depositions, the report of plaintiff's biomechanist, Paul Ivancic, Ph.D., and all of the documents listed in my report dated February 17, 2023. *See* Exhibit LEVITAN REPORT. On July 22, 2021 I also attended a site inspection of the subject ladder located at Building "D" of the construction site located at a property consisting of multiple contiguous lots between Bayport Place/Birdsall Avenue and Dix Avenue, Queens, New York (the "Project").

5. I have reviewed and analyzed the foregoing documents with specific regard to the happening of the subject incident and associated allegations and, accordingly, have developed the following understanding and opinions. All of my opinions provided herein are to a reasonable degree of scientific certainty.

The Incident

6. Plaintiff testified that he started work at 7:00 a.m. and that his fall occurred at the end of the day, which was shortened due to excessive heat, when he was leaving to go home. He further testified that on the day of his fall, he fell from the ladder located between the first and second floors (the "subject ladder"). Plaintiff specified that he went up and down the subject ladder

multiple times per day and that 20 – 30 people who were working on the second floor descended the ladders before him to leave that day, all without incident.

7. According to plaintiff's testimony, he typically descended the ladder by placing his right foot on the second rung and then his left foot on the third rung of the subject ladder. At the time of his accident, both of Plaintiff's hands were on the first rung, which was at approximately floor level.

8. Plaintiff initially testified that his right foot was on the second rung at the time of the fall, but then clarified that his right foot was in the process of being lowered to the third rung and was not in contact with the subject ladder when he fell. He further testified he was facing the ladder at the time of his fall, with his head still over the top of the floor, and looking down at the rung on which he was going to place his foot.

9. According to Plaintiff, his left foot, which was positioned on the third rung, slipped and "I tried to grab, but it was impossible." *See* Ex. Plaintiff EBT at 153. Plaintiff believed that his hands, which slipped immediately after his left foot slipped, did so due to his weight. Although Plaintiff testified that both of his hands slipped at the same time, later in his deposition he stated that he was not sure. He further testified that when his left foot slipped it went straight down, but "My weight brought me to the right side." *See* Ex. Plaintiff EBT at 162. As a result, Plaintiff testified that he fell through the adjacent access opening located to the right of the ladder and into the cellar level. He specifically denied utilizing the available hand rails that extended 42" above the second-floor landing.

10. According to Plaintiff, he did not strike the guard rails or anything else before going through the access opening, and he could not recall the orientation / position of his body as he fell. Finally, Plaintiff testified that he was not caused to fall due to the ladder breaking or moving.

11. In contrast to Plaintiff's testimony, eye witness Guillermo Sanchez Melgarejo testified that he observed Plaintiff fall head first, striking the subject ladder before hitting the guardrail around the access opening with his back at around waist level and falling down to the cellar. He further testified that Plaintiff was facing the wall and away from the ladder at the time of his fall.

12. The subject location was part of the Far Rockaway Phase III construction project. Specifically, the subject incident occurred in "Building D", which was designed as a multi-story, mixed-use building.

13. The Prehospital Care Report Summaries indicated that Plaintiff's chief complaint was that his back hurt, but he was also bleeding from his left elbow and had hematomas on the back of his right arm and chest.

14. Based on the Jamaica Hospital Medical Center records dated June 30, 2021, Plaintiff was 67 inches in height and approximately 202 pounds at the time of the subject incident.

Site Inspection

15. As part of my investigation, on July 22, 2021, I conducted an inspection of the subject location, particularly the temporary wooden access ladders (i.e. gang ladders) located in the elevator shaft between the cellar and first floor, and first floor and second floor at the Project site.

16. In addition to my observations and measurements, a Faro Focus Laser Scanner was used to take three-dimensional laser scans of the subject ladder and surrounding area. Based upon my inspection, review of the relevant records discussed above, including the report of Preston Quick, P.E., and his site inspection of July 7, 2021, the subject ladder, adjacent guardrail and surrounding area were in a similar condition that existed at the time of the subject accident.

17. A wooden guardrail system (top rail, mid-rail, and toe board) was positioned around the opening with the top rail at a height of approximately 60 inches high. The guardrail system surrounded the access opening on three sides and was 39 inches wide, and 53 inches long. The subject ladder was of a wooden construction and included 14 rungs, with the top "rung" having a horizontally oriented piece of plywood positioned on it. The top rung was positioned approximately 3½ inches below the second floor and measured approximately 31½ inches wide and 13½ inches deep. Structural components of the ladder limited the usable width of the plywood near the front edge to approximately 29 inches. The height of the top rung, where Plaintiff testified that his hands were positioned, was approximately 13 feet 2½ inches above the floor below and 8 feet 1¼ inches above the adjacent guardrail system around the floor access opening. The width of the ladder was approximately 30 inches, which included the rungs and siderails. The slope of the ladder was approximately 75 degrees. Much of the ladder, including the rungs, was constructed of nominal 2 x 4 lumber (i.e. 1 ½ inches x 3 ½ inches). The rungs were generally spaced one foot apart. Handrails were located on each side of the ladder at a height of approximately 12½ inches above the siderail of the ladder, measured perpendicular to the face of the ladder. The handrails were wooden 2 x 4 construction and extended approximately 42 inches beyond the second floor. A wooden cleat was positioned at the bottom of the ladder to secure it and prevent the ladder from slipping at the base. The cleat was approximately 24¾ inches away from the opposing wall and the ladder was approximately 52 ½ inches from the wall located on the right side when facing the ladder. There was no notable debris of dirt observed on the ladder. The top of the ladder was secured by the siderails, which extended approximately 42 inches above the second floor. In addition, a wooden guardrail system was located on the second floor on both sides of the ladder

opening with the top rail at a height of 42 inches, the mid-rail was at a height of 21 inches, and the toe board at a height of 8½ inches.

18. There was no notable debris or dirt observed on the subject ladder, and multiple witnesses that utilized the ladder just moments before plaintiff's accident confirmed the absence of same.

Discussion

19. Plaintiff alleges that he was caused to fall from the subject ladder due to his left foot slipping on dirt/debris located on the ladder rungs. He also testified, however, that the amount of dirt on the ladder at the time of his fall was normal and that he had never slipped before even though he used the ladders multiple times per day. There were also no prior incidents of workers slipping on the ladders even though all of the workers had to use the ladders to access the second floor. Furthermore, multiple coworkers testified that they had exited the location by means of the subject ladder without issue within minutes of Plaintiff, and first responders to the scene also testified to using the ladder without issue.

20. Based on the materials reviewed, including Plaintiff's own deposition testimony, there is no evidence that the ladder broke or failed in any way during the subject incident.

21. There is inconsistency within the testimony provided as to the presence or absence of a handrail/safety railing on the subject ladder. Even though some of Mr. Rivera's coworkers testified that there was no handrail on the ladder at the time of his fall, there is no photographic evidence from the day of the incident showing the absence of the handrails to substantiate this fact. Other coworkers testified that there was a handrail/safety railing on the subject ladder. Photographs taken the following day of the subject ladder clearly show the presence of the handrails on the subject ladder. It is noted that the testimony of the individuals on site who were responsible for

safety and supervising the work being performed supported the fact that the handrails were placed on all access ladders although at times they were removed to accommodate the work that needed to be performed. Either way, this is a distinction without a difference as such safety railings were not (per the affidavit of engineer Preston Quick and testimony of DOB witness Daniel Greer) required under any code.

22. Plaintiff testified that immediately prior to the subject incident he was standing on the ladder and facing it with both of his hands on the top rung, his right foot on the first rung down, and his left foot on the second rung below the top. *See* Figure 1, below.



Figure 1. Illustration of Plaintiff's position on ladder immediately prior to incident.

23. It is noted that the top rung of the subject ladder was located approximately 3½ inches below the second floor and was covered with a flat piece of plywood. Thus, although Mr. Rivera would have been able to place his hands on said "rung" he would not have been able to grip it [Figure 2], thus reducing the amount of force he could produce on the surface with his hands.

4858-7734-9741.1



Figure 2. Illustration of Plaintiff's hands located on the top rung of the ladder.

24.     There were other components of the subject ladder, however, that would have allowed (and, in fact, are intended) for gripping/grasping by Plaintiff while he was transitioning to the subject ladder and beginning his descent. If handrails were present on the ladder he could have availed himself to grasp them. But, even if they were not, he also could have grasped the extensions of the ladder siderails that extended 42" above the second-floor landing, whose presence are not in dispute.

25.     Given Plaintiff's described kinematics, immediately before his left foot slipped on the second rung from the top of the ladder, Plaintiff would have been facing the ladder with his right foot lifting off of the first rung below the top, and he would have been weight bearing on his left foot, with forces also being applied to the top rung of the ladder through his hands.

26.     The only external force being applied to Plaintiff would have been that due to gravity, which would have been directed vertically downward.

27.     To maintain stability on the ladder, Plaintiff would have needed to apply opposing forces greater than or equal to his body weight onto the ladder. Immediately prior to his fall, he would have been maintaining a base of support on the ladder with his two hands and left foot.

28. When his left foot slipped off of the ladder as he testified to, Plaintiff's center of mass (i.e. torso) would have moved in a downward direction toward the ground at the base of the subject ladder due to the removal of a portion of his base of support. This initial downward movement is consistent with Plaintiff's testimony.

29. Plaintiff testified that his hands were separated from the rung due to his body weight and came off of the rung because he was not able to generate enough force to counteract his body weight of approximately 202 pounds as it accelerated feet first towards the ground.

30. Based on his initial position, Plaintiff's center of mass would have experienced free fall at the rate of 32 ft/s² until his body was extended and additional forces were applied to his hands. The force applied would have been greater than that of his body weight at a magnitude determined by how far his center of mass would have fallen prior to the force being applied to his hands.

31. Based upon his own deposition testimony, Plaintiff's center of mass was located between the siderails of the subject ladder prior to the slipping of his left foot and thus, his center of mass would have been to the left of the guardrail system and the access opening to the cellar.

32. Since there is no evidence that any additional forces were exerted onto Plaintiff during the subject incident besides that of gravity, if both of his hands slipped off of the ladder simultaneously, as he initially testified to, Plaintiff's center of mass would have continued to move feet-first in a straight downward direction due to gravity with insignificant lateral movement. Therefore, as Plaintiff continued to fall to the ground, his center of mass would have continued to be within the siderails of the ladder and to the left of the access opening.

33. Consequently, Plaintiff's center of mass would not have been positioned above, or fallen into, the access opening to the cellar below. [Figure 3]



Figure 3. Illustration of the location of Plaintiff's center of mass and the direction of his fall after both hands slipped off of the ladder simultaneously.

34. If his right hand slipped off of the ladder rung prior to his left, any lateral excursion of his center of mass would have been to his left-hand side, away from the access opening, as he started to pivot about his left hand. Given that he fell through the access opening into the cellar, this scenario is not biomechanically consistent with Plaintiff's fall kinematics.

35. If Plaintiff's left hand slipped off of the ladder rung prior to his right hand, his center of mass would have initially moved in a sudden downward and rightward direction. Due to the acceleration of his center of mass due to gravity during free-fall as indicated above, Plaintiff's right hand would have slipped off the ladder prior to full extension of his right arm. At full extension, his right hand would have been required to exert a force greater than that of his body weight to prevent slipping off of the rung. Based on his own deposition testimony, Plaintiff would not have been able to accomplish this magnitude of exertion. Thus, Plaintiff's right hand would have slipped off of the ladder rung prior to full extension of his right arm and thus prior to his center of mass moving past his pivot point on the ladder rung (i.e. location of his right hand). As indicated above,

4858-7734-9741.1

if Plaintiff's center of mass did not move beyond the siderail of the ladder, it would not have been over the access opening and he would not have fallen into the cellar. Given that Plaintiff fell through the access opening into the cellar, the scenario testified to by Plaintiff is not biomechanically consistent with his fall kinematics.

36. Therefore, from a biomechanical perspective, Plaintiff did not fall from the subject ladder while using it in a normal and proper manner and/or in the manner in which he described at his deposition.

37. Based on my review of the materials and my analysis, regardless of whether or not a handrail was present on the subject ladder at the time of the subject incident, Plaintiff's described kinematics are not consistent with the laws of physics and the principles of biomechanics for a fall into the cellar opening. Therefore, Plaintiff did not fall through the cellar access opening due to a slippery condition on the subject ladder as he described.

38. Moreover, the eye witness account by Guillermo Sanchez Melgarejo also contradicts Plaintiff's described kinematics. Mr. Melgarejo testified that after hearing a loud noise, he observed Plaintiff falling head first towards the ground. Plaintiff also testified that he did not hit anything prior to falling into the access opening to the cellar, but Mr. Melgarejo testified that Plaintiff struck the subject ladder and then the guardrail around the access opening. Furthermore, Mr. Melgarejo specified that Plaintiff struck the guardrail at approximately waist level and towards his backside.

39. Mr. Melgarejo's described kinematics are more aligned with Plaintiff's diagnosed injuries, including the left-sided rib fractures. It is also noted that Mr. Melgarejo testified that he was caused to turn and observe Plaintiff falling after he heard a loud noise. If it is assumed that the loud noise was associated with a causative factor of Plaintiff's fall, the precipitating event that

caused the noise would have to have occurred above the first floor. Thus, it is possible that Plaintiff did not actually fall from the subject ladder at all.

40. Although the cause of Plaintiff's fall is unknown, there is no evidence that the structure, proximity to the access opening, or condition of the subject ladder were contributing factors in his fall into the cellar opening. Though it cannot be confirmed how plaintiff's accident occurred, I can state within a reasonable degree of scientific certainty that it did not occur as described by Plaintiff in his testimony as the version presented by him is biomechanically impossible.

41. I declare under penalty of perjury that the foregoing is true and correct. Executed on June 29, 2023, at Bucks County, Pennsylvania.

*Angela Levitan*
ANGELA LEVITAN, Ph.D., CPE