EXHIBIT LEVITAN REPORT



**ARCCA,** INCORPORATED
2288 SECOND STREET PIKE
P.O. BOX 78
PENNS PARK, PA 18943
**PHONE** 215-598-9750 **FAX** 215-598-9751
www.arcca.com

February 17, 2023

Billy H. Kim, Esquire
Ropers, Majeski, Kohn & Bentley, PC
750 3rd Avenue
25th Floor
New York, NY 10017

Re:  *Rivera, Roman De Gabriel v. Lettire Construction Corp., Mott Center, LLC, Redfern FRP, LLC, Phipps Houses, Rockaway Village III Housing Development Fund Corporation, FRV Phase 3 LIHTC, LLC and MooreGroup Corporation*
ARCCA File No.: 6082-001

Dear Mr. Kim:

Thank you for the opportunity to participate in the above-referenced matter. Your firm hired ARCCA, Incorporated to perform an analysis of the subject incident in relation to Mr. Roman De Gabriel Rivera. This analysis is based on information currently available to ARCCA, and is only to be issued in its entirety. However, ARCCA reserves the right to supplement or revise this report if additional information becomes available.

The opinions given are based on my analysis of the available materials using scientific and engineering methodologies generally accepted in the scientific community.[1] These opinions are also based on my education, experience, background, and knowledge of biomechanics, human factors and kinematics, and human injury mechanisms and tolerance. I am presently employed as a Senior Biomechanist/Human Factors Engineer for an engineering firm known as ARCCA, Inc. I obtained a Doctor of Philosophy degree in Industrial and Systems Engineering, Human Factors Option from Virginia Tech and a Master of Science degree in Industrial and Systems Engineering, with an emphasis in Safety Engineering from Virginia Tech. I also received a Master of Science degree in Mathematics from Virginia Tech and a Bachelor of Arts in Mathematics from the University of Connecticut. I have completed advanced coursework in the fields of musculoskeletal biomechanics, human factors, safety, kinesiology, physiology, ergonomics, safety, occupational biomechanics, and impact biomechanics. I am a Certified Professional Ergonomist (CPE), and a member of the American Society of Biomechanics, American Society of Safety Professionals, Human Factors and Ergonomics Society, ASTM International F13 Committee on Pedestrian/Walkway Safety, International Code Council, International Society for Occupational Ergonomics and Safety, and IEA Slips, Trips and Falls Committee. I maintain an OSHA 30-Hour Outreach Training for the Construction Industry Certification, an OSHA Fall Protection for the Competent Person Certification, an OSHA Scaffolding Safety for the Competent Person Certification, an OSHA 10-Hour Outreach Training Program – General Industry Certification, an OSHA Industrial Truck Operator Certification, an NYC DOB 4-Hour Supported Scaffolding User Certification, an NYC DOB 32-Hour Supported Scaffold Installer/Remover Certification and NYC DOB 8-Hour Site Safety Coordinator Training. I was a National Academies Member of the Committee on Review of the NIOSH Construction Research Program, NIOSH 2019 and 2022 Study Section Grant Reviewer, and in 2011 was designated as one

---

[1]  Carey, S. S. (2011). A Beginner's Guide to Scientific Method (Fourth ed.). Cengage Learning.

Billy H. Kim, Esq.
February 17, 2023
Page 2



of "100 Women Making a Difference in the Safety, Health and Environmental Profession" by ASSE's Women in Safety Engineering.

While at Virginia Tech, I taught courses to both undergraduate and graduate students related to Human Factors Engineering, Industrial Engineering, Safety, and Occupational Biomechanics. I performed experimental three-dimensional motion analyses, as well as extensive kinematic and kinetic studies of the human body. My testing and research have been performed with human subjects. These tests and research studies have added to my formal education in biomechanics and injury causation. As such, I am very familiar with the theory and application of human tolerance to the areas of slip, trip, and fall incidents and ergonomics, as well as the techniques and processes for evaluating mechanisms of injury using scientifically accepted techniques to assess the potential for injury during a particular incident.

Upon graduating from Virginia Tech, I worked for approximately 10 years at the Liberty Mutual Research Institute for Safety in Hopkinton, Massachusetts. During my tenure at Liberty Mutual, I completed multiple research projects that examined the mechanisms of balance control on level and elevated surfaces, including slips and falls and working on ladders. This included the influence of individual, task, and environmental factors. Completion of these projects required knowledge, use, and application of ANSI and ASTM standards to accurately translate real-world situations to laboratory scenarios, and apply laboratory findings to real-world circumstances and conditions. Motivation for the research projects was partially derived from the construction industry and integrated site visits and consultations with field representatives.

I also have extensive experience related to distracted walking, assessment of physical and mental workload, and effects of dual-tasking on performance. I have published in the areas of postural control, gait analysis, occupational biomechanics, and human factors and ergonomics and have given multiple technical presentations at domestic and international scientific conferences. While at ARCCA, I continue to conduct technical lectures dealing with the causation and prevention of injury trauma.

**Incident Description:**

According to the materials reviewed, on June 30, 2021, at approximately 2:30 p.m., Roman De Gabriel Rivera, a 45-year-old man at the time, reportedly fell while descending a wooden temporary ladder on the construction site located at 1626 Village Lane in Far Rockaway, New York.

**Materials Reviewed:**

As part of my analysis in this matter, I performed the following tasks and reviewed numerous documentary materials, including, but not limited to:

- Boro Concrete Incident/Accident Report

- Lettire Accident Investigation Report dated June 30, 2021

- Safe Site Medical Report

- NYCDOB Worker Fell Incident Report

- NYC Buildings Incident Information

- Color reproductions of photographs of the subject ladder and location

- Video footage of subject location (multiple views)

- Engineering Drawings for Typical Working Platform Thru Elevated Opening

ARCCA
INCORPORATED

- Moore Group Corporation Engineering Drawings for Safety Platforms
- Amended Complaint
- Plaintiff's Initial Disclosure
- Defendant's Initial Disclosures
- Plaintiff's Supplemental Initial Disclosure dated June 10, 2022
- Plaintiff's Supplemental Initial Disclosure dated June 14, 2022
- Plaintiff's Supplemental Initial Disclosure dated June 20, 2022
- Plaintiff's Amended Initial Disclosure as to Video Clips dated June 24, 2022
- Plaintiff's Supplemental Initial Disclosure dated November 4, 2022
- Plaintiff's Supplemental Initial Disclosure dated November 23, 2022
- Plaintiff's Supplemental Initial Disclosure dated June 1, 2022
- Deposition Transcripts of Roman Rivera taken on May 18, 2022, June 14, 2022, and August 11, 2022
- Deposition Transcript of Ralph DiDonato taken on June 23, 2022
- Deposition Transcript of James Pigoot taken on July 8, 2022
- Deposition Transcript of John Moore taken on July 12, 2022
- Deposition Transcript of Daniel Greer taken on July 15, 2022
- Deposition Transcript of Gregory Casabona taken on July 22, 2022
- Deposition Transcript of Paul Hastings taken on August 5, 2022
- Deposition Transcript of Yesenia Lopez taken on August 11, 2022
- Deposition Transcript of William Luna taken on August 15, 2022
- Deposition Transcript of Adrian Rivera taken on August 25, 2022
- Deposition Transcript of Nelson Tipan taken on September 1, 2022
- Deposition Transcript of Manolo Paz taken September 2, 2022
- Deposition Transcript of Fredy Paz taken on September 2, 2022
- Deposition Transcript of Jose Cabrera taken on September 7, 2022
- Deposition Transcript of Frank Buczynski taken on September 7, 2022
- Deposition Transcript of Cesar De Gabriel taken on September 13, 2022
- Deposition Transcript of Larry De Gabriel taken on September 13, 2022
- Deposition Transcript of Luis Lopez taken on September 19, 2022
- Deposition Transcript of Peter Vaccaro taken on September 26, 2022
- Deposition Transcript of Alex Tipan taken on October 3, 2022

Billy H. Kim, Esq.
February 17, 2023
Page 4



- Deposition Transcript of Angel Hernandez taken on November 3, 2022

- Deposition Transcript of Ruben Rivera Valencia taken on November 3, 2022

- Deposition Transcript of Guillermo Sanchez Melgarejo taken on November 21, 2022

- Deposition Exhibits

- Prehospital Care Report Summaries (2) dated June 30, 2021

- Medical Records pertaining to Roman Rivera

- Engineering Report of Preston Quick dated February 15, 2023

- ARCCA Site Inspection conducted on July 22, 2021

- Publicly available literature, including, but not limited to, the documents cited within the report, learned treatises, textbooks, and scientific standards.

**Findings:**

The subject location was part of the Far Rockaway Phase III construction project. Specifically, the subject incident occurred in "Building D", which was designed as a multi-story, mixed-use building. The general contractor for the construction project was the Lettire Construction Corp. ["Lettire"]. Lettire contracted with the Moore Group Corp. / Boro Concrete ["Moore Group"] to perform the cast and place concrete operations of the superstructure and foundation. As part of the construction project, carpenters employed by the Moore Group constructed and installed temporary wooden ladders in the future elevator shaft to provide access between floors of the building as it was being erected and before permanent stairs were installed. Roman Rivera was a rebar lather who worked for the Moore Group in the "rebar group". The foreman of the rebar group for the Moore Group was Ruben Rivera, and the general foreman was Manolo Paz. In addition, Jose Cabrera was the concrete safety manager for the Moore Group.

The subject incident occurred on a Wednesday. The Boro Concrete Incident/Accident Report described the incident as occurring in Building D at 2:25 p.m. when Mr. Rivera, who was descending the "gang" ladder to leave the job, slipped and fell down from the first level to the cellar level, hitting the ladder and the wall on the way down.

The Lettire Accident Investigation Report describes the incident as occurring in Phase III Building D at 2:30 p.m. The condition of the concrete floor in the fall area was described as "broom finish" and the lighting conditions were indicated to be good.

The NYCDOB Worker Fell Incident Report describes that a worker fell approximately six (6) feet into the cellar while accessing a gang ladder at close of shift. The NYC Department of Buildings concluded that the fall was due to worker error.

Based on historical climatological data, the weather was fair and dry with a high temperature of 91ºF.[2]

The Prehospital Care Report Summaries indicated that Mr. Rivera's chief complaint was that his back hurt, but he was also bleeding from his left elbow and had hematomas on the back of his right arm and chest.

Based on the Jamaica Hospital Medical Center records dated June 30, 2021, Mr. Rivera was 67 inches in height and approximately 202 pounds at the time of the subject incident. The records indicate that

---

[2]    Weather Underground, www.wunderground.com, John F. Kennedy International Airport Station.



his discharge diagnoses were paraplegia, a closed stable burst fracture of thoracic vertebra, left 2-4 rib fractures, subarachnoid hemorrhage, and a manubrium fracture.

*Deposition Testimony*

Based on the testimony of several people who were working at the construction site and/or involved in the construction of the subject building, the wooden gang ladders located on site, including the subject ladder that provided access between the first and second floors, were typical in the construction industry. At the time of the subject incident, the ladders on the first floor provided the only means for accessing the second floor from the first floor. Gregory Casabona, the site safety manager for Building D employed by Lettire, testified that the wooden ladders were constructed per OSHA regulations, except that the handrails were not required by OSHA. William Luna, the Moore Group carpentry foreman testified that all gang ladders were constructed with handrails/guardrails. There is no testimony or evidence that there were prior incidents of workers slipping and/or falling from any of the ladders. In addition, none of the workers testified that they had issues utilizing the ladders and there is no evidence of any complaints made regarding the ladders prior to the subject incident. Based on the materials reviewed, regular meetings were held on site in which ladder safety was discussed, including the need to maintain three points of contact with the ladder when ascending and descending. Several workers testified that although they were taught not to carry things while on the ladders, many of them did carry small things and some materials even though there was a hoist available to move materials between floors.

Jose Cabrera, the concrete safety manager, testified that it was his responsibility to make sure that all the concrete protocols are being met and that "all the work is being done up to code with standards, drawings". [Cabrera dep p16] Mr. Cabrera explained that the wooden ladders were anchored with a block at the bottom so they do not slide and that they are "nailed down" or "spiked in" at the top so that they did not move. Mr. Cabrera further testified that the ladders were constructed with handrails as an additional safety measure, although sometimes the handrails were temporarily removed depending on the work being performed. According to Mr. Cabrera, the handrails were on the ladder at the time of the subject incident. Mr. Cabrera also explained that the ladder rails extended three feet above the second floor. According to Mr. Cabrera, he used the subject ladder on the day of the subject incident and it was in good condition and the rungs were clean.

Manolo Paz was the Moore Group general foreman at the construction site for the concrete portion of the building. Mr. Paz further testified that on the day of the subject incident they were starting the fourth floor of the building. According to Mr. Paz, the carpenters installed the access ladders between the floors and that the ladders had handrails on them, although it is possible that at times they were removed because of the work being performed. Mr. Paz testified that he was not aware of any work done to the subject ladder after the incident, beyond putting up caution tape, and that if there was he would have known about it. Mr. Paz further testified that there were regular meetings, including toolbox talks and pre-shift meetings, at which ladder safety was discussed. According to Mr. Paz, he was not aware of any complaints regarding the ladders and although he used the ladder, he never saw dirt or debris on the ladder.

Mr. Roman Rivera testified that he had completed the OSHA 30-hour safety training course and was an employee of Moore Group with years of construction experience at the time of the subject incident. Mr. Rivera further testified that he had been working at the Far Rockaway site for 8 – 10 months working with rebar and his foreman was Ruben Rivera. According to Mr. Rivera, when he started at the site he was given a site orientation that included safety topics. During the course of his employment at the site, he also attended regular safety meetings, at which, the proper use of ladders

Billy H. Kim, Esq.
February 17, 2023
Page 6



was discussed. Mr. Rivera testified that he was aware that you had to face the ladder when ascending/descending and that you could not carry anything heavy while on the ladder, although he believed that it was permissible for him to hold small things in one hand, including a "bag with tools".

Mr. Rivera testified that ladders were used to access the different floors of the construction site. [Figure 1] Mr. Rivera further testified that the ladders were located in the future elevator shaft and it was normal to use such ladders. Mr. Rivera testified that sometimes he carried materials or his backpack over his shoulder while he was on the ladders. Mr. Rivera further testified that he sold drinks and sandwiches to workers that he kept in coolers. According to Mr. Rivera, he occasionally carried empty coolers while on the ladders. Mr. Rivera described that site as having poured concrete floors, a basement with a height of 14 – 15 feet, and a first floor with a height of 15 – 17 feet.



**Figure 1. Wooden ladders used to provide access between the first and second floors of the construction site.**

Mr. Rivera testified that he started work at 7:00 a.m. and that his fall occurred at the end of the day, which was shortened due to excessive heat, when he was leaving to go home. Mr. Rivera further testified that on the day of his fall, the site consisted of three floors, but that he fell from the ladder located between the first and second floors. Mr. Rivera specified that he went up and down the ladder multiple times per day and that 20 – 30 people who were working on the second floor descended the ladders before him to leave that day.

Mr. Rivera described his fall incident:

> "*Well, that I was going down, that I began going down from the second to the first. On the third step I slipped, because there's always sand and dirt, and I went through the hole on the side that is access to the other floor.*" [Rivera dep p149, June 14, 2022]

Mr. Rivera testified that the ladder rungs always had sand and dirt on them, including at the time of his fall, but although he thought it was dangerous, he never complained. Mr. Rivera further testified that "it was normal to work like that with the ladders, with the dirt. It was normal." [Rivera dep p.148, June 14, 2022] According to Mr. Rivera, he never had any prior issues slipping on the ladder and did



Billy H. Kim, Esq.
February 17, 2023
Page 7

not take any precautions due to the condition of the ladders, except that he held onto the ladders tightly while he was ascending and descending them. Mr. Rivera testified that he was wearing steel-toed non-slip work boots and had nothing in his hands at the time of his fall.

Mr. Rivera testified that he always started to descend the ladder by placing his right foot on the second rung and then his left foot on the third rung. Mr. Rivera further testified that both of his hands were on the first rung, which was at approximately floor level. Mr. Rivera initially testified that his right foot was on the second rung at the time of the fall, but then clarified that his right foot was in the process of being lowered to the third rung and was not in contact with the ladder when he fell. Mr. Rivera testified that he was facing the ladder at the time of his fall, with his head still over the top of the floor, and looking down at the rung on which he was going to place his foot. According to Mr. Rivera, his left foot, which was positioned on the third rung [Figure 2], slipped and "I tried to grab, but it was impossible." [Rivera dep p.153, June 14, 2022] Mr. Rivera believed that his hands, which slipped immediately after his left foot slipped, did so due to his weight. Although Mr. Rivera testified that both of his hands slipped at the same time, later in his deposition he stated that he was not sure. Mr. Rivera further testified that when his left foot slipped it went straight down, but "My weight brought me to the right side." [Rivera dep p.162, June 14, 2022] Mr. Rivera further testified that he fell through the hole, located to the right of the ladder, into the basement. According to Mr. Rivera, he did not strike the guard rails around the hole, or anything else before going through the hole. Mr. Rivera could not recall the orientation / position of his body as it went through the hole. Mr. Rivera testified that he was not caused to fall due to the ladder breaking or moving.



**Figure 2. The location of Plaintiff's left foot immediately prior to his fall as indicated with a blue circle positioned by Plaintiff during his deposition. Railings indicated with green and yellow arrows were not present at the time of the fall, as testified to by Plaintiff.**

Guillermo Melgarejo, a coworker of Mr. Rivera's, testified that at the time of the subject incident, he was changing his clothes on the first floor approximately 20 feet from the subject ladders when he heard an impact and turned to see Mr. Rivera already falling head first from the second to the first floor. Mr. Melgarejo further testified that he saw Mr. Rivera hit the ladder and then hit the guardrail around the access opening on the first floor with his back at around waist level, but he did not hear



any sounds coming from Mr. Rivera. According to Mr. Melgarejo, the front of Mr. Rivera's body was facing the wall, not the ladder. Mr. Melgarejo testified that he did not know what caused Mr. Rivera to fall, but stated that he had used the subject ladder that same day without any issue, including that there was no debris on the ladder rungs. Mr. Melgarejo further testified that he never had any complaints about the ladder or heard anyone else make complaints. During his testimony, he was inconsistent as to whether or not the subject ladder had handrails at the time of the incident.

Alex Tipan, a coworker of Mr. Rivera, testified that he was changing his clothes at the end of the day on the first floor and standing approximately 15 feet from the subject ladder. Mr. Alex Tipan further testified, however, that he did not witness the fall, but was one of the first people to respond to the scene in the cellar. According to Mr. Alex Tipan, when he first saw Mr. Rivera, he was laying on his side on a piece of plywood located on the cellar floor on the side of the ladder and his hard hat was on the floor near him. Mr. Alex Tipan testified that Mr. Rivera did not change his clothes at the site and he did not see any of his personal belongings nearby in the cellar. Nelson Tipan, a coworker of Mr. Rivera, testified that he was next to Guillermo Melgarejo changing his clothes approximately 30 feet from the ladder when he saw something fall. Mr. Nelson Tipan confirmed Mr. Rivera's initial position in the cellar and that there were no personal belongings nearby. According to Mr. Nelson Tipan, he had used the subject ladder to reach the first floor where he was changing his clothes and the ladder was clean, secure, and "normal".

Ruben Valencia, the rebar foreman for the Moore Group, testified that he had completed the OSHA 30-hour safety training and the 40-hour site safety training. Mr. Valencia further testified that regular safety meetings and toolbox talks were held at the construction site. According to Mr. Valencia, there were no restrictions regarding carrying items while ascending or descending the ladders. Mr. Valencia testified that he had used the wooden ladder on the day of the fall and did not have any difficulty. Mr. Valencia further testified that the ladders were secured and that he did not observe any debris on the ladder. According to Mr. Valencia, he returned to the construction site at 6:30 a.m. the next morning and noted that there was a handrail on the subject ladder. Mr. Valencia also confirmed that he could see a handrail on the wooden ladder in the cellar within the video footage he was shown that was taken at the scene immediately following the fall.

Daniel Greer was an Inspector for the New York City Department of Buildings on the day of the subject incident working in the Construction Safety Enforcement Unit. Mr. Greer testified that on the day after the incident he walked the entire construction site as a follow-up for the injury that had occurred during the subject incident. Mr. Greer further testified that he found no deficiencies with the ladder and determined that the incident was "worker error". [Greer dep p50] Based on Mr. Greer's testimony and the materials reviewed, no citations were issued that were causative of Mr. Rivera's fall.

Several additional Moore Group workers provided deposition testimony regarding the subject construction site. The workers provided inconsistent testimony in regards to the presence/absence of handrails on the subject ladder at the time of the subject incident, but most workers testified that they climbed the ladder without issues and grasped the ladder rungs while ascending and descending the ladder. Furthermore, none of the workers testified that they reported or complained about the ladder rungs being slippery due to worksite conditions.

*Site Inspection*

As part of my investigation, on July 22, 2021, I conducted an inspection of the subject location, particularly the temporary wooden access ladders (i.e. gang ladders) located in the elevator shaft between the cellar and first floor, and first floor and second floor. In addition to my observations and



measurements, a Faro Focus Laser Scanner was used to take three-dimensional laser scans of the ladders and the surrounding area. It was noted that changes had been made to the surrounding area (e.g. caution tape was located across the ladder access opening on the first floor and a piece of plywood was located on top of the guardrail system on the first floor), but that the ladders and guardrails were in a similar condition that existed at the time of the subject incident. Mr. Preston Quick also conducted a site inspection on July 7, 2021, and took photographs and measurements.

Particular attention was paid to the subject ladder located between the first and second floors. The first floor was measured to be nominally level. The opening in the floor, which provided access for the ladder leading to the cellar, was located adjacent to, and to the right, when facing the subject ladder. A wooden guardrail system (top rail, mid-rail, and toeboard) was positioned around the opening with the top rail at a height of approximately 60 inches high. The guardrail system surrounded the access opening on three sides and was 39 inches wide, and 53 inches long. The subject ladder was of a wooden construction and included 14 rungs, with the top "rung" having a horizontally oriented piece of plywood positioned on it. [Figure 3] The top rung was positioned approximately 3½ inches below the second floor and measured approximately 31½ inches wide and 13½ inches deep. Structural components of the ladder limited the usable width of the plywood near the front edge to approximately 29 inches. The height of the top rung, where Mr. Rivera testified that his hands were positioned, was approximately 13 feet 2½ inches above the floor below and 8 feet 1¼ inches above the adjacent guardrail system around the floor access opening. The width of the ladder was approximately 30 inches, which included the rungs and siderails. The slope of the ladder was approximately 75 degrees. Much of the ladder, including the rungs, was constructed of nominal 2 x 4 lumber (i.e. 1 ½ inches x 3 ½ inches). The rungs were generally spaced one foot apart. Handrails were located on each side of the ladder at a height of approximately 12½ inches above the siderail of the ladder, measured perpendicular to the face of the ladder. The handrails were wooden 2 x 4 construction and extended approximately 42 inches beyond the second floor. A wooden cleat was positioned at the bottom of the ladder to secure it and prevent the ladder from slipping at the base. The cleat was approximately 24¾ inches away from opposing wall and the ladder was approximately 52 ½ inches from the wall located on the right side when facing the ladder. There was no notable debris of dirt observed on the ladder. The top of the ladder was secured by the siderails, which extended approximately 42 inches above the second floor. In addition, a wooden guardrail system was located on the second floor on both sides of the ladder opening with the top rail at a height of 42 inches, the mid-rail was at a height of 21 inches, and the toeboard at a height of 8½ inches.

Billy H. Kim, Esq.
February 17, 2023
Page 10





**Figure 3. View from the second floor looking down at top rung of subject ladder, which was covered with a piece of plywood. [Photograph taken during Preston Quick's inspection]**

## Analysis and Discussion:

Mr. Rivera alleges that he was caused to fall from a temporary wooden access ladder due to his left foot slipping on dirt/debris located on the ladder rungs. Mr. Rivera testified, however, that the amount of dirt on the ladder at the time of his fall was normal and that he had never slipped before even though he used the ladders multiple times per day. There were also no prior incidents of workers slipping on the ladders even though all of the workers had to use the ladders to access the second floor. Furthermore, multiple coworkers testified that they had exited the location by means of the subject ladder without issue within minutes of Mr. Rivera and first responders to the scene also testified to using the ladder without issue. Based on the materials reviewed, there is no evidence that the ladder broke or failed in any way during the subject incident. However, there is inconsistency within the testimony provided as to the presence or absence of a handrail/safety railing on the subject ladder. Even though some of Mr. Rivera's coworkers testified that there was no handrail on the ladder at the time of his fall, there is no photographic evidence from the day of the incident showing the absence of the handrails to substantiate this fact. Other coworkers testified that there was a handrail/safety railing on the subject ladder. Photographs taken the following day of the subject ladder clearly show the presence of the handrails on the subject ladder. It is noted that the testimony of the individuals on site who were responsible for safety and supervising the work being performed supported the fact that the handrails were placed on all access ladders although at times they were removed to accommodate the work that needed to be performed.

Mr. Rivera testified that immediately prior to the subject incident he was standing on the ladder and facing it with both of his hands on the top rung, his right foot on the first rung down, and his left foot on the second rung below the top. [Figure 4] It is noted that the top rung of the ladder, as indicated above, was located approximately 3½ inches below the second floor and was covered with a flat piece of plywood. [See Figure 3] Thus, although Mr. Rivera would have been able to place his hands on the "rung" he would not have been able to grip it [Figure 5], thus reducing the amount of force he



could produce on the surface with his hands.[3,4,5,6,7] There were other components of the ladder, however, that would have allowed for gripping/grasping by Mr. Rivera while he was transitioning to the ladder and beginning his descent. If handrails were present on the ladder he could have availed himself to grasp them. He also could have grasped the extensions of the ladder siderails, whose presence are not in dispute. [Figure 6]



**Figure 4. Illustration of Plaintiff's position on ladder immediately prior to incident.**

[3]    Imrhan, S.N. (1989). Trends in finger pinch strength in children, adults, and the elderly. Human Factors, 31: 689-701.

[4]    Mathiowetz, V. et al. (1985). Grip and pinch strength: normative data for adults. Archives of Physical Medicine and Rehabilitation, 66: 69-74.

[5]    DiDomenico, A. and Nussbaum, M.A. (2003). Measurement and prediction of single and multi-digit finger strength. Ergonomics, 46(15): 1531-1548.

[6]    Gerodimos, V., Karatrantou, K., Psychou, D., Vasilopoulou, T., & Zafeiridis, A. (2017). Static and Dynamic Handgrip Strength Endurance: Test-Retest Reproducibility. J Hand Surg Am, 42(3), e175-e184.

[7]    Beschorner, K. E., Slota, G. P., Pliner, E. M., Spaho, E., & Seo, N. J. (2018). Effects of Gloves and Pulling Task on Achievable Downward Pull Forces on a Rung. Human Factors, 60(2), 191-200.

Billy H. Kim, Esq.
February 17, 2023
Page 12





**Figure 5. Illustration of Plaintiff's hands located on the top rung of the ladder.**



**Figure 6. Access opening to ladder on second floor, including siderail extensions above the floor level that are indicated with arrows. [Photograph taken during Preston Quick's inspection]**

Given Mr. Rivera's described kinematics, immediately before his left foot slipped on the second rung from the top of the ladder, he was facing the ladder with his right foot was lifting off of the first rung below the top. Mr. Rivera would have been weight bearing on his left foot, with forces also being applied to the top rung of the ladder through his hands. The only external force being applied to Mr. Rivera would have been that due to gravity and would have been directed vertically downward. To

Billy H. Kim, Esq.
February 17, 2023
Page 13



maintain stability on the ladder, Mr. Rivera would have needed to apply opposing forces greater than or equal to his body weight onto the ladder.[8] Immediately prior to his fall, he would have been maintaining a base of support on the ladder with his two hands and left foot. When his left foot slipped off of the ladder as he testified to, his center of mass (i.e. torso) would have moved in a downward direction toward the ground at the base of the ladder due to the removal of a portion of his base of support.[9] This initial downward movement is consistent with Mr. Rivera's testimony. Mr. Rivera testified that his hands were separated from the rung due to his body weight, thus, Mr. Rivera's hands came off of the rung because he was not able to generate enough force to counteract his body weight of approximately 202 pounds as it accelerated feet first towards the ground. Based on his initial position, his center of mass would have experienced free fall at the rate of $32 \text{ ft/s}^2$ until his body was extended and additional forces were applied to his hands. The force applied would have been greater than that of his body weight at a magnitude determined by how far his center of mass would have fallen prior to the force being applied to his hands.

Based on Mr. Rivera's testimony, his center of mass was located between the siderails of the ladder prior to the slipping of his left foot and thus, his center of mass would have been to the left of the guardrail system and the access opening to the cellar. Since there is no evidence that any additional forces were exerted onto Mr. Rivera during the subject incident besides that of gravity, if both of his hands slipped off of the ladder simultaneously, as Mr. Rivera initially testified to, his center of mass would have continued to move feet-first in a straight downward direction due to gravity with insignificant lateral movement. Therefore, as Mr. Rivera continued to fall to the ground, his center of mass would have continued to be within the siderails of the ladder and to the left of the access opening. [Figure 7] Consequently, Mr. Rivera's center of mass would not have been positioned above, or fallen into, the access opening to the cellar below.

---

[8]    Resnick, R. and Halliday, D. (1977). Physics. John Wiley & Sons, New York.
[9]    Hay, J. G., & Reid, J. G. (1988). Anatomy, mechanics, and human motion (2nd ed.). Prentice Hall.





**Figure 7. Illustration of the location of Plaintiff's center of mass and the direction of his fall after both hands slipped off of the ladder simultaneously.**

After initially testifying that both of his hands slipped off of the ladder simultaneously, Mr. Rivera subsequently testified that he was not sure of this fact. Based on Mr. Rivera's testified-to pre-slip position, if his right hand slipped off of the ladder rung prior to his left, any lateral excursion of his center of mass would have been to his left-hand side, away from the access opening, as he started to pivot about his left hand. Given that Mr. Rivera fell through the access opening into the cellar, this scenario is not biomechanically consistent with his fall kinematics. If Mr. Rivera's left hand slipped off of the ladder rung prior to his right hand, his center of mass would have initially moved in a sudden downward and rightward direction. Due to the acceleration of Mr. Rivera's center of mass due to gravity during free-fall as indicated above, his right hand would have slipped off the ladder prior to full extension of his right arm. At full extension, Mr. Rivera's right hand would have been required to exert a force greater than that of his body weight to prevent slipping off of the rung. Based on Mr. Rivera's testimony, he would not have been able to accomplish this magnitude of exertion. Thus, Mr. Rivera's right hand would have slipped off of the ladder rung prior to full extension of his right arm and thus prior to his center of mass moving past his pivot point on the ladder rung (i.e. location of his right hand). As indicated above, if Mr. Rivera's center of mass did not move beyond the siderail of the ladder, it would not have been over the access opening and he would not have fallen into the cellar. Given that Mr. Rivera fell through the access opening into the cellar, this scenario is not biomechanically consistent with his fall kinematics. Thus, from a biomechanical perspective, Mr.



Rivera did not fall from the ladder while using it in a normal and proper manner. Based on my review of the materials and my analysis, regardless of whether or not a handrail was present on the subject ladder at the time of the subject incident, Mr. Rivera's described kinematics are not consistent with the laws of physics and the principles of biomechanics for a fall into the cellar opening. Therefore, Mr. Rivera did not fall through the cellar access opening due to a slippery condition on the subject ladder as he described.

As part of my investigation, I reviewed the Engineering Report of Preston Quick dated February 15, 2023. It is noted that for this matter it was not within the scope of my analysis to determine if the subject ladder was properly constructed and in compliance with applicable codes. For these determinations, I am relying on the testimony of the Department of Building's witness, Daniel Greer, and the opinions of Preston Quick, a licensed professional engineer. Mr. Quick opines that the subject first-floor wooden job-made ladder was in good repair, safe for its intended use, and compliant with applicable New York Industrial Code Rules and OSHA Regulations for Construction applicable to ladders and ladderways in construction operations. Thus, although the cause of Mr. Rivera's fall is unknown, there is no evidence that the structure, proximity to the access opening, or condition of the ladder were contributing factors in Mr. Rivera's fall into the cellar opening. Moreover, the only witness account, by Mr. Melgarejo, also contradicts Mr. Rivera's described kinematics. Based on Mr. Rivera's described kinematics, he would have fallen feet first towards the ground after his left foot slipped off of the ladder rung. Mr. Melgarejo testified that after hearing a loud noise, he observed Mr. Rivera falling head first towards the ground. Mr. Rivera also testified that he did not hit anything prior to falling into the access opening to the cellar, but Mr. Melgarejo testified that Mr. Rivera hit the ladder and then the guardrail around the access opening. Furthermore, Mr. Melgarejo specified that Mr. Rivera struck the guardrail at approximately waist level and towards his backside. Mr. Melgarejo's described kinematics are more aligned with Mr. Rivera's diagnosed injuries, including the left-sided rib fractures. It is also noted that Mr. Melgarejo testified that he was caused to turn and see Mr. Rivera falling after he heard a loud noise. If it is assumed that the loud noise was associated with a causative factor of Mr. Rivera's fall, the precipitating event that caused the noise would have to have occurred above the first floor. Thus, it is possible that Mr. Rivera did not fall from the subject ladder.

**Conclusions:**

Based upon a reasonable degree of scientific certainty, and the information received to date, I conclude the following:

1.  On June 30, 2021, at approximately 2:30 p.m., Roman De Gabriel Rivera, a 45-year-old man at the time, reportedly fell while descending a temporary wooden access ladder on the construction site located at 1626 Village Lane in Far Rockaway, New York.

2.  Based on Mr. Rivera's described kinematics, he did not avail himself of a structural component of the ladder that was graspable as he descended the ladder.

3.  Mr. Rivera did not fall through the cellar access opening due to a slippery condition on the subject ladder as he described.

4.  Mr. Rivera's described kinematics are not consistent with the laws of physics and the principles of biomechanics for a fall that would result in his falling through the cellar access opening from the temporary wooden access ladder.



Billy H. Kim, Esq.
February 17, 2023
Page 16

5. Although the cause of Mr. Rivera's fall is unknown, there is no evidence that the structure, proximity to the access opening, or condition of the ladder were contributing factors in Mr. Rivera's fall into the cellar opening.

If you have any questions, require additional assistance, or if any additional information becomes available, please do not hesitate to call.

Sincerely,

*Angela Levitan*

Angela Levitan, Ph.D., CPE
Senior Biomechanist/Human Factors Engineer