```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   ROMAN DE GABRIEL RIVERA,

 4                   Plaintiff,

 5         v.                             21 CV 6006 (AS)

 6   LETTIRE CONSTRUCTION CORP., et
     al.,
 7
                     Defendants.          Conference
 8   ------------------------------x
                                          New York, N.Y.
 9                                        January 17, 2024
                                          1:10 p.m.
10
     Before:
11
                          HON. ARUN SUBRAMANIAN,
12
                                          District Judge
13

14                          APPEARANCES

15   JASON L. PARIS
          Attorney for Plaintiff
16        -and-
     RONAI & RONAI, LLP
17   BY:  HOLLY OSTROV RONAI
          PETER RONAI
18
     ROPERS MAJESKI KOHN & BENTLEY PC
19        Attorneys for Defendants
     BY:  JASON L. BECKERMAN
20        BILLY H. KIM

21

22

23

24

25
```

```
 1                  (Case called)
 2                  MR. PARIS:  For the plaintiff, Jason Paris of Paris
 3    Law Group as lead trial counsel.  Good afternoon, your Honor.
 4                  THE COURT:  Good afternoon.
 5                  MS. OSTROV RONAI:  Good afternoon, your Honor, Holly
 6    Ostrov Ronai of Ronai & Ronai for the plaintiff.
 7                  THE COURT:  Good afternoon.
 8                  MR. BECKERMAN:  Good afternoon, your Honor, Jason
 9    Beckerman and Billy Kim for the defendants.
10                  Oh, I'm sorry.  I didn't see Peter.
11                  THE COURT:  If you can grab that microphone and pull
12    it over.
13                  MR. RONAI:  Sure.
14                  Peter Ronai of Ronai & Ronai on behalf of the
15    plaintiff.  Good afternoon, your Honor.
16                  THE COURT:  Good afternoon.
17                  For the defendants.
18                  MR. BECKERMAN:  Jason Beckerman and Billy Kim for the
19    defendants.  Good afternoon, your Honor.
20                  THE COURT:  Good afternoon.
21                  Who is lead trial counsel for the defendants?
22                  MR. BECKERMAN:  Jason Beckerman.
23                  THE COURT:  Just to make things easier, you can remain
24    seated during argument because it's very important that you get
25    picked up on that microphone.
```

1                  We are here for a final pretrial conference.  Trial is

2       upon us.  I want to start with some just ground rules for the

3       trial.  We can talk about some of the other issues in terms of

4       the motions *in limine* that remain pending, exhibits, and

5       demonstratives and then deposition testimony, if we have time.

6       And if we don't have time, then we are going to have to come

7       back on the Monday before trial starts.  We are starting on a

8       Tuesday.  If there is something that we don't get resolved

9       today, we can handle the remaining matters on that Monday.

10                 First of all, both sides should contact the court

11      reporter's office to arrange for daily transcripts.  You should

12      make those arrangements before trial begins so we don't have to

13      figure it out while we are trying the case.

14                 Both sides should contact the court, you can contact

15      Mr. Hernandez here, to set up a time for an AV walkthrough so

16      you understand the technology in the courtroom, and we won't

17      have disruptions based on trying to make the systems work with

18      your -- whatever technology you're bringing in.

19                 Are we going to have any interpreters during this

20      trial?

21                 MR. PARIS:  Yes, your Honor.

22                 THE COURT:  You'll make those arrangements in advance.

23      I assume that there will be an agreed interpreter.  Ideally, it

24      will be from this court's office so they are official

25      interpreters.  You'll make those arrangements in advance.  If

1    there are any issues, you can contact the Court.

2              All exhibits and demonstratives should be presented

3    electronically absent good cause.  If you look up here, you'll

4    see that each of the jurors has a terminal.  The Court has one,

5    the witness has one.  We should be able to do this

6    electronically.  Of course I understand that you may have

7    demonstratives or other physical exhibits that you need to

8    bring in.  That's fine.  But to the extent that things are

9    being presented in paper form, they should be presented

10   electronically.  That being said, witnesses will often ask to

11   see the paper exhibits, so each side should have in the

12   courtroom a set of paper exhibits just in case anyone needs

13   them.

14             In terms of the trial and scheduling, counsel should

15   be at the court and ready to proceed no later than 8:45 in the

16   morning on each trial day.  Trial will promptly commence at 9

17   a.m.  That means that the jury, I am going to make sure that

18   they are here at 9 a.m.  When they come out, we should be

19   prepared to proceed, whether it's an examination or opening

20   statements or closing arguments.

21             This is an adjustment from the individual practices,

22   but just in light of the number of witnesses that we have

23   scheduled here, the trial day will be from 9 a.m. to 4 p.m.

24   with appropriate breaks in the morning and afternoon and for

25   lunch.

1          The Court will seat eight jurors.  I understand the

2     parties had said that they would be comfortable with six

3     jurors.  We take eight jurors to make sure that if we lose one

4     of the jurors or two of the jurors during the trial, which we

5     have to be mindful about in the COVID-19 era, we will still be

6     able to proceed.

7          Each side will have about a couple of minutes, not

8     much more than that, to come up with their peremptory

9     challenges after we have gone through the for-cause grounds for

10    striking.  So the way we will do it is, we will have 14 jurors

11    in the box.  We will go through the questioning.  Once we have

12    14 jurors with no-cause strikes, I'll give the parties a chance

13    to give their peremptory challenges.  Those will be done

14    simultaneously, so I'll just have folks come up at sidebar.

15    You will give me a Post-it note on each side with the jurors

16    that you want to strike, and we will then have our eight

17    jurors, which will be the lowest number of jurors.  If you end

18    up striking all the same people, we will just pick the first

19    eight.

20         Demonstratives.  This is an issue that actually comes

21    up in some of the exhibit objections and some of the other

22    matters.  There are exhibits and then there are demonstratives.

23    Exhibits are evidence that the jury can look at in the jury

24    room and that are part of the record of the case.  Then there

25    are demonstratives, which either side might have some of these

1    that they want to use to assist understanding of testimony, but

2    you are not seeking to introduce them as evidence.

3          As to demonstratives, those don't need to have been

4    disclosed on the exhibit list and there is one, I think, issue

5    about discovery that might raise this.  They do need to be

6    exchanged in advance.

7          And so what I've done at the last trial we just had is

8    to have, the day before, if there are any demonstratives that

9    are going to be used with the witness, those need to be

10   exchanged.  If there are objections to the use of those

11   demonstratives, you just need to send an email to the Court

12   indicating that you have an objection that you can't resolve as

13   to a demonstrative, send the demonstrative with that email by 7

14   p.m. the night before their use, and we will then commence the

15   following day at 8:30 a.m. and resolve any outstanding

16   objections.

17         Let me stop there and ask both sides if they have any

18   questions just on those threshold logistical issues.

19         Mr. Paris.

20         MR. PARIS:  No, your Honor.

21         THE COURT:  Mr. Beckerman.

22         MR. BECKERMAN:  Your Honor, how many preempt

23   challenges does each party get?

24         THE COURT:  Three.

25         MR. BECKERMAN:  Thank you.

1          THE COURT:  Let's get into the motions *in limine*.

2          First, there is a letter motion filed, this is at

3    docket 253, a letter motion for the exclusion of some untimely

4    produced evidence.

5          Mr. Paris, if you want to pick this up.  This is your

6    application.  It has to do with what I understand, it looks, at

7    least, from the attachment, to be a demonstrative that the

8    defendants seek to use with one of their witnesses.  Maybe I'll

9    turn to Mr. Beckerman first.

10         MR. BECKERMAN:  I think that issue was withdrawn, your

11   Honor, as we resolved the motions *in limine* that were pending.

12   I think that was connected to one of the withdrawn plaintiff's

13   motions.

14         THE COURT:  Because it was presented separately from

15   the motions *in limine*, but you are telling me it has been

16   resolved.

17         MR. BECKERMAN:  I believe so, yes.

18         MR. PARIS:  Your Honor, based on the rules that you

19   just advised of, if the timeliness of that being given to us is

20   not a proper objection as it's a demonstrative exhibit, then

21   it's a moot objection.

22         THE COURT:  It wasn't clear from the papers whether

23   the defendants were seeking to introduce that as evidence,

24   which I wouldn't do anyway because it has clearly been

25   modified.  That was the only lack of clarity.

 1                    Docket number 253 will be denied as moot.

 2                    Then as to the remaining motions *in limine*, first of

 3    all, on the plaintiff's motion *in limine*.

 4                    MR. BECKERMAN:  Your Honor, can I go back for one

 5    second.  I apologize.  Was that letter from us or from the

 6    plaintiff?

 7                    THE COURT:  It was from the plaintiffs.

 8                    MR. BECKERMAN:  Was that related to Angela

 9    Levitan's --

10                    THE COURT:  It was related to the image from the

11    plaintiff video, I think, annotations on it.

12                    MR. BECKERMAN:  I think we have agreed that can be

13    used at trial.  I apologize.

14                    THE COURT:  That's fine.  Let's start with the motions

15    *in limine*.

16                    The first one is plaintiff's motion *in limine* on

17    Dr. Levitan.

18                    First of all, Mr. Paris, you would agree that in terms

19    of just the timing of this submission, it was not filed as to

20    the deadline that this Court or the predecessor Court requires

21    *Daubert* motions to be submitted, correct?

22                    MR. PARIS:  Yes, your Honor.  It was filed within the

23    motion *in limine* deadline, not by the prior deadline, that's

24    correct.

25                    THE COURT:  Any explanation, or you just missed that?

1          MR. PARIS:  I'm sorry, your Honor?

2          THE COURT:  Any explanation for the delay, or is it

3     just --

4          MR. PARIS:  We don't believe it's a *Daubert* motion,

5     your Honor.  The defendant characterizes it as one, but the

6     motion that we made in the application that we are making, I

7     don't believe it would be construed as a *Daubert* application.

8          THE COURT:  To the extent that aspects of

9     Dr. Levitan's report -- let me take a step back.  You're not

10    saying that what is in Dr. Levitan's report fails to meet the

11    requirements of Rule 702, correct?

12         MR. PARIS:  Correct.  And we are also not challenging

13    her qualifications as a biomechanical engineer.  The nature of

14    the application begins with the fact that, based on her report,

15    it doesn't appear that she is offering a biomechanical analysis

16    at all.

17         THE COURT:  As I understand it, you're raising a Rule

18    402, 403 challenge to her anticipated testimony.

19         MR. PARIS:  Yes, your Honor.

20         MR. BECKERMAN:  Your Honor, before we get to that, can

21    I point out that the first paragraph of their motion on that

22    issue starts out with the *Daubert* standard?

23         THE COURT:  Right.  But the plaintiff has advocated

24    that part of the challenge, as I'm understanding it.  My

25    recollection was the same as yours, but to the extent that it

 1    was based on that, they are withdrawing it.

 2         MR. BECKERMAN:  Thank you.

 3         THE COURT:  I'm looking at page 10 of Dr. Levitan's

 4    report where it starts -- the last paragraph there, Mr. Rivera

 5    testified, from that through to page 14, ending with,

 6    biomechanically consistent with his fall kinematics.  As to

 7    that portion of the report, given that there is no objection to

 8    Dr. Levitan's capacity to testify as to those matters and Rule

 9    702, it would seem that that would fall within the broad

10    boundaries of Rule 402 and Rule 403.

11         Dr. Levitan is applying her expertise to say that if

12    you accept the plaintiff's testimony and you apply the rules of

13    just kinematics and how forces would have been applied to

14    Mr. Rivera's body, given his testimony, he would have fallen in

15    a way that would not have resulted in the accident that we

16    have.  That's all she is saying.

17         Am I wrong about that, Mr. Beckerman?

18         MR. BECKERMAN:  That's the only question that we posed

19    to her.  Not how did the accident happen, but could he have

20    wound up in the basement if it happened the way he says it

21    happened.

22         THE COURT:  In terms of a factual basis, she is not

23    trying to offer her own theory on what actually happened.  She

24    is just saying that if you accept Mr. Rivera's testimony, that

25    this is what kinematics and biomechanics would tell you what

1  happened.  That is all she is going to testify about.

2          MR. BECKERMAN:  That's exactly what we asked her to

3  do.  Assume everything he says is true, could he have wound up

4  in the basement.

5          THE COURT:  Right.

6          Mr. Paris, that would seem to fall within Rule 402 and

7  Rule 403.  There is a question of whether that testimony is

8  tactically beneficial to the defendants or not, given that

9  narrow scope.

10          But, from your perspective, if that's all she is going

11  to testify about, that would seem to be within the bounds of

12  Rule 402 and Rule 403.  Think about that for just a moment

13  because I outlined a couple of pages of her report, but then

14  there are other pages of her report.

15          As to the other parts of her report, I am not going to

16  allow her -- because what I understand the report, at least,

17  like shows is that the remaining parts of the report have

18  nothing to do with biomechanics or kinematics.  It is simply

19  Dr. Levitan regurgitating other evidence in the record that has

20  nothing to do with her stated expertise.  She is being a

21  mouthpiece for other evidence in the record.  You are going to

22  be able to bring in that other evidence.

23          If you want to show that there was no slippery

24  condition on the ladder or that there were sufficient

25  protections on the ladder, I think there is still a disputed

1   issue as to whether there were safety rails on the ladder at

2   the time of the incident.  And if you want to make that

3   argument, then that's an argument that you can make.  However,

4   that's not fairly within Dr. Levitan's scope.

5          MR. BECKERMAN:  I agree with you.  I think she was

6   just being thorough in describing what she had reviewed, as

7   opposed to taking position on that.

8          THE COURT:  I understand.  I appreciate that.

9          Unless, Mr. Paris, you have any issue or want to argue

10  further, what I would say is that the motion would be granted

11  in part as to the other aspects of Dr. Levitan's report,

12  putting aside just the background like, I referred to Mr.

13  Rivera's testimony.  He said, this, this, and this, so now let

14  me get into my analysis.  That's fine.

15         What she shouldn't be doing is talking about, well,

16  the other expert said there was no slippery condition or this

17  witness said that there were safety rails.  That stuff is not

18  within the bounds.

19         MR. BECKERMAN:  I would just ask then that she not be

20  cross-examined on what did you review to open that door to the

21  rest of her report.  I will go into it with her about reviewing

22  the deposition transcript, but I just don't want to open the

23  door to the rest of that report.

24         THE COURT:  Everything is subject to opening the door.

25  This is a motion *in limine*.  If the other side opens the door,

1    all you need to do is approach.  You will say:  I think that

2    the plaintiff opened the door, they may disagree with you, we

3    will have that discussion, and we will figure it out.

4                    MR. BECKERMAN:  Thank you.

5                    THE COURT:  Subject to all of that, Mr. Paris, any

6    objection to any further discussion?  My tentative ruling would

7    be to grant the motion to the extent that it is on the other

8    parts of the report, but to deny it as to this section that I

9    identified.

10                   MR. PARIS:  Just to clarify the section, your Honor, I

11   have from the bottom of page 10, the second paragraph, under

12   the analysis and discussion section that starts with Mr. Rivera

13   testified, through and including the bottom of page 14, the

14   last full sentence that ends with biomechanically consistent

15   with his fall kinematics.

16                   THE COURT:  Yes.

17                   MR. PARIS:  The only other issue I have, your Honor,

18   is that her demonstrative exhibit seems to have things

19   contained in it that are from the precluded parts of the report

20   consistent with the rules that you provided us with a few

21   minutes ago.  Obviously, a new demonstrative exhibit can be

22   provided to us by the day before.

23                   I'm advising the Court now, as it's even earlier than

24   7 p.m. the night before, that if the intent is to use the

25   demonstrative exhibit that we have already been provided with,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    it contains things, I believe, that have been precluded within

2    it.

3         THE COURT:  Mr. Beckerman, are you going to redo those

4    just to conform with the Court's order?  I am not looking at

5    the demonstrative, so I don't have it in front of me.

6         MR. BECKERMAN:  I think we are going to need an

7    opportunity to go through the report and see which parts fit

8    into your Honor's section or which parts fall outside of that.

9    Maybe we can have a discussion with plaintiff's counsel and

10   make sure we agree.  If we don't, we will present that to the

11   Court.  I just haven't had a chance with that limitation to --

12        THE COURT:  Just to give you an example, figures 4, 5,

13   6, and 7, those might be demonstratives that you would use.

14   I'm just guessing.  To the extent you were just looking at

15   them, I don't see any issues with those particular --

16        MR. BECKERMAN:  If I could ask for clarification from

17   plaintiff's counsel.  Is the photograph the issue that he has,

18   or is it the demonstrative drawings?

19        MR. PARIS:  The demonstrative drawings.  If we are

20   talking about photographs, obviously, to the extent that

21   photographs are contained within her demonstrative exhibit that

22   are photographs that we have agreed not be shown to the jury,

23   they should be taken out.  But my issue that I'm raising here

24   is with the animation, not with the photographs.

25        MR. BECKERMAN:  With regard to the animation, it will

1    be our intention to have her use those as demonstrative

2    evidence because that describes the forces that she is talking

3    about in her testimony.  The photograph we certainly consent

4    to.  The parties have identified, I think it was four

5    photographs that we will -- those are the only ones we will

6    rely on at trial, either party, and we won't seek to put any

7    other photographs in.

8            THE COURT:  Mr. Paris, do you have an issue with the

9    demonstrative animation?

10           MR. PARIS:  I believe I do, your Honor, but

11   Mr. Beckerman makes a good point, that if we are afforded the

12   opportunity at some point to do a side-by-side comparison with

13   what's contained within the animation and what your Honor has

14   ruled she is and is not allowed to testify to, they may choose

15   to edit the animation or we may not have an objection to it,

16   depending on what's in there.  It hasn't been evaluated yet in

17   accordance with the ruling.

18           MR. BECKERMAN:  I also believe that the letter

19   agreement that was filed yesterday agreed that we would not

20   have initial objections to demonstrative evidence and that we

21   would only object if on cross-examination it was revealed that

22   for some reason the demonstrative evidence doesn't represent

23   what was actually at the scene, that there would not be an

24   initial objection, and both parties agreed to that in the

25   letter that was filed with the Court yesterday.

 1            MR. PARIS:  Yes, of course.  But it specifically says:

 2    If the Court denies plaintiff's remaining motions *in limine*,

 3    then plaintiff does not initially object.

 4            THE COURT:  Here is what we are going to do.

 5            First of all, there is no demonstrative evidence.

 6    That's what I said at the outset.  It's just a demonstrative or

 7    it's evidence.  It's an important distinction because the rules

 8    of evidence, technically, until the proposed amendment

 9    regarding demonstratives is adopted, applied to evidence that

10    goes back into the jury room.  The Court always has the ability

11    to police the use of abusive demonstratives, but that's what we

12    are talking about.

13            Now, because all of the demonstratives may not have

14    been exchanged and because the Court is now making rulings that

15    might have an impact on this, let's say by Wednesday of next

16    week, if there are prepared demonstratives, meaning not

17    something they are coming up with like the day before

18    testimony, but something that you have already got in the

19    hopper, those need to be exchanged.  Any objections need to be

20    raised by Friday and then, if necessary, we will schedule a

21    hearing for Monday to review any of those objections.

22            I don't understand the no-initial objection if only on

23    cross.  If the demonstrative shows something that's totally out

24    of line with the evidence on either side's view, then the Court

25    is not going to let it in.  But the Court understands that each

1    side has a position as to what was going on the day of the

2    accident, and so it's basically a prejudice over probative

3    value analysis.  OK.

4        MR. BECKERMAN:  Can I ask one clarifying question on

5    demonstrative evidence.  Are the parties permitted to use the

6    demonstrative evidence on closing?

7        THE COURT:  Yeah.

8        We will talk about that.  Under certain circumstances,

9    yes.  Under certain circumstances, no.  Because if it is being

10   represented as evidence that the jury can consider in

11   deliberations, the answer is no.  Usually, it's supposed to be

12   used in connection with a witness' testimony.

13       So while the witness is talking about a complex

14   matter, such as kinematics and biomechanics, they can refer

15   then to an animation that describes visually what they are

16   talking about.  That's the core use.  There are certain times

17   when you can use a demonstrative in closing, but that's a

18   different analysis, and we will get to that when we get going

19   in trial.

20       Anything further on Dr. Levitan?  I think we have

21   resolved that.

22       MR. PARIS:  Yes, your Honor.

23       There are things contained within those three and a

24   half pages which plaintiff contends are speculative, and

25   therefore she shouldn't be permitted to testify as to them.  I

1    can address that now or we can address it at the time of her

2    testimony if she employs the speculation during her live

3    testimony and I object to the question or the answer, whichever

4    you prefer.

5            MR. BECKERMAN:  Or we can discuss it ahead of trial

6    and maybe we can resolve it.

7            THE COURT:  It seems like on something like that you

8    might be able to resolve it before trial.  I understand that

9    there are certain limited things that she might testify about

10   and you would object as the testimony being speculative.

11           Is that what you are saying.

12           MR. PARIS:  Yes, your Honor.

13           THE COURT:  Without seeing the testimony, it's hard to

14   evaluate that in the abstract.  If there is something you want

15   to point me to in that section of the report that we can look

16   at right now, I'm happy to consider it.

17           MR. PARIS:  Your Honor, so as to not waste the time of

18   the Court, rather than read and parse through four and a half

19   pages worth of single spaced, I'll endeavor to do that after

20   the court hearing today and speak to Mr. Beckerman about it,

21   unless your Honor sees something --

22           THE COURT:  I'm just looking at page 11, for instance.

23   There is a section here:  If handrails were present on the

24   ladder, he could have availed himself to grasp that.

25           Is that an example of something that you would think

1    would be speculative in her report or is it something -- that

2    is not the issue?

3        MR. PARIS:  Yes, your Honor.  The same for the next

4    sentence, now that I'm looking at it.  He also could have

5    grasped.

6        THE COURT:  That's probably not even going to come up.

7    I agree that it's speculative.  I don't know what it has to do

8    with her analysis because her analysis is based on whatever

9    facts she considered about the plaintiff's narrative and then

10   showing through biomechanical analysis that that testimony is

11   not consistent with the nature of the accident to undermine the

12   credibility of the plaintiff's case.  If it's not that, let's

13   not get into it because I understand there will be an objection

14   on those grounds.  OK?

15       MR. PARIS:  Thank you, your Honor.

16       THE COURT:  That takes care of Levitan.

17       Just give me one second.

18       Is there no dispute anymore about whether the ladder

19   had safety or handrails?

20       MR. BECKERMAN:  We will not be contesting that it did

21   not have handrails.

22       THE COURT:  Did not have handrails.  OK.

23       Second -- this is another housekeeping issue -- there

24   was an interlocutory appeal filed.  I forget whether it was the

25   plaintiff or the defendant that filed it.

1              MR. BECKERMAN:  It was us, your Honor.  I apologize.

2    We have already reached out to plaintiff's counsel.  It was

3    misdiaried on a clerk's calendar for filing and accidentally

4    got filed early.  We have been working with plaintiff's

5    counsel's office to try to withdraw it, and that is seemingly

6    harder than you would expect.

7              THE COURT:  I imagine that it might be difficult.

8    You'd have to look at the rules to see if it was appropriately

9    filed.  It may not have been.  I'll leave that to the parties.

10             MR. BECKERMAN:  It was not appropriately filed.  We

11   are trying to withdraw it.

12             THE COURT:  Neither side believes that deprives this

13   Court of any jurisdiction.

14             MR. BECKERMAN:  No.

15             THE COURT:  Just an open question.  Take care of that.

16             Next we will go to the plaintiff's motion on

17   Dr. Lequerica.

18             Mr. Paris, is Dr. Lequerica, did he treat Mr. Rivera?

19             MR. PARIS:  No, your Honor.

20             THE COURT:  Because the defendants say they have an

21   actual declaration from Dr. Lequerica to say that he was

22   treated.

23             MR. PARIS:  The interesting thing about that

24   declaration, your Honor, is that in order to obtain that

25   declaration, they would have had to speak with the doctor.

1          The authorization that was provided by plaintiff's

2    counsel provided for the doctor to give a record, not to speak

3    to anybody.  No doctor is going to speak to anybody regarding

4    one of their patients who they treat without a HIPAA

5    authorization giving him authority to do so.  It's a very

6    serious HIPAA violation to do so in general, specifically in

7    the context of a litigation, of speaking to the counsel for the

8    adverse party.

9          That in and of itself, the fact that they got that

10   affirmation, affidavit, declaration from Dr. Lequerica, without

11   involving us, without involving our client, clearly indicates

12   that he doesn't consider himself to be a treating physician for

13   the purposes of the Privacy Act which governs physician

14   conduct.

15         I see his declaration.  It is, your Honor, very

16   artfully worded.  It specifically says that -- it uses the word

17   independent medical examination when it talks about workers

18   compensation carrier and when it talks about the other entity.

19   This was not an independent medical examination.

20         The way that the plaintiff came to be seen by

21   Dr. Lequerica, your Honor, is that it was noted by one of his

22   other doctors that he had traumatic brain injury component and

23   required some care for that, and the network manager at

24   Paradigm Outcomes referred him first to a different doctor, but

25   that doctor wasn't taking any patients, and then to

1    Dr. Lequerica, because what she needed to find was someone who

2    spoke Spanish to be able to communicate with him.  There was

3    that one evaluation for the purpose of Paradigm Outcomes.

4         There was no treatment rendered, there were no

5    recommendations made to the plaintiff as to treatment to

6    undergo.  It merely allowed the catastrophic-care management

7    division to know how they should be guided in terms of

8    additional treatment that the plaintiff would benefit from

9    which he then began with Dr. Busichio, who is testifying in

10   this case as a neuropsychologist.

11        THE COURT:  Mr. Beckerman.

12        MR. BECKERMAN:  A couple of points.

13        First, as far as the HIPAA issue, the HIPAA law

14   requires that he does not discuss the nature of the medical

15   treatment with us, not the fact that he did treat.  We never

16   got into any discussion about the treatment itself or anything

17   that was shared between him and the plaintiff beyond what, I

18   guess, is contained in his report already, but even that

19   discussion did not happen; just whether or not he was a

20   treating physician or somebody retained to examine the

21   plaintiff.

22        The declaration speaks for itself.  He says he is a

23   treating physician.  There was nothing artfully intended about

24   the wording in there.  It seemed that the objection that was

25   being raised is that he was somehow associated with an

 1    independent medical examination for workers compensation, so we

 2    tried to address that issue.  He himself says he's a treating

 3    physician.

 4            I will also point out that Dr. Busichio, who they are

 5    calling as their neuropsych expert to support the TBI claim, in

 6    her records she goes through the medical history and talks

 7    about his reports.

 8            I don't understand, if he wasn't part of treatment,

 9    why Dr. Busichio, who they are putting on the stand as the

10    treating physician, is incorporating his findings into her

11    report which, by the way, she cherrypicks the bad parts and

12    ignores the conclusion of Dr. Lequerica that he has a mild TBI,

13    but only cherrypicks the words that make it sound like it's

14    severe.

15            So if her report was to go in without any benefit of

16    hearing from him, you would be left with the impression that

17    there are two doctors who believe he has a significant

18    cognitive injury.

19            MR. PARIS:  Your Honor, just on that last point first.

20            THE COURT:  Let me just ask you.  Tell me again, why

21    did Mr. Rivera see Dr. Lequerica?

22            MR. PARIS:  Yes, your Honor.

23            So Dr. Lequerica, who, by the way, doesn't treat

24    patients and doesn't have any records of treatment, he just has

25    his report, was asked by the network manager at Paradigm

1    Outcomes, the network manager in the catastrophic care

2    management division, to perform testing to see if he would

3    benefit from treatment for a traumatic brain injury as part of

4    his course of care through the catastrophic-care management

5    division.  In fact --

6           THE COURT:  Is that an insurance thing?  That's what

7    I'm asking.

8           MR. BECKERMAN:  If I can interject.

9           THE COURT:  Sure.

10           MR. BECKERMAN:  As I understand it, since the

11    plaintiff is getting workers comp benefits, when he goes to

12    them and says, I'm having memory problems or, I'm having this

13    or, I'm having problems with my leg, Paradigm is the company

14    that will help refer him to a doctor to guide the course of

15    treatment.

16           So Paradigm referred him to Dr. Lequerica, obviously,

17    the findings were not what plaintiff wanted, and they went on

18    to Dr. Busichio.  But there is no doubt that the purpose of his

19    report was to examine in a patient setting the plaintiff, do

20    neuropsychological testing, and come up with a finding that

21    would direct the future of his treatment.

22           MR. PARIS:  Your Honor, I resent the implication that

23    plaintiff's counsel didn't like the findings.

24           MR. BECKERMAN:  I didn't say plaintiff's counsel.

25           MR. PARIS:  Or plaintiff.

1          THE COURT:  It's a mixed bag.  I am not so sure that

2    Dr. Lequerica's testimony is going to help the defendants.  He

3    is going to be subject to cross-examination.  Nobody knows what

4    he is going to say on cross-examination.  He acknowledges that

5    Mr. Rivera has had a very difficult recovery.  So it's not as

6    if this is just an ace in the hole for the defendants.

7          But the issue that we are dealing with is really one

8    of disclosure.

9          Mr. Beckerman, what's the best case that you have that

10   indicates not that you have to provide a report for

11   Dr. Lequerica, because you don't have to, but that the

12   disclosure requirements of Rule 26 are inapplicable here.

13         MR. BECKERMAN:  There are two cases that I would rely

14   on, Judge.  *Davids v. Novartis Pharms. Corp.*

15         THE COURT:  What's the citation there?

16         MR. BECKERMAN:  The citation is 857 F.Supp.2d. 267

17   (E.D.N.Y. 2012).  I would specifically refer the Court to the

18   subsection, subletter A.

19         THE COURT:  Do you have a page number for that?

20         MR. BECKERMAN:  No, I don't.  If you give me one

21   moment, I will try to find a page number.

22         I believe the section that I am referring to is on

23   page 270, but I can't be a hundred percent certain because the

24   copy I have does not have -- but I'm happy to read the section

25   in that I'm referring to.

1                THE COURT:  I see it right here.

2                MR. BECKERMAN:  It starts off with:  It's well

3     settled.

4                THE COURT:  Right.

5                As to that first sentence, it is well settled that a

6     treating physician is not subject to the disclosure obligations

7     set forth in Rule 26(a)(2)(B).  That is what I said.  I don't

8     disagree with that.  There is no report that was required as to

9     Dr. Lequerica because that's what (a)(2)(B) is.  (a)(2)(A) and

10    (a)(2)(C) have to do with disclosure of any witness who is

11    going to provide testimony that falls under Rule 702.

12               There are things that Dr. Lequerica could certainly

13    testify to that would not fall under Rule 702.  The fact that I

14    saw Mr. Rivera and the fact that he told me this or that or the

15    other thing, right, those types of things would not fall under

16    Rule 702.

17               MR. BECKERMAN:  I can then refer the Court to *Brusso*

18    *v. Imbeault*.  The citation is 699 F.Supp.2d. 567.  I will try

19    to find a page number for you.  This is on the point your Honor

20    is raising.

21               THE COURT:  OK.

22               MR. BECKERMAN:  Page 578.  The paragraph that starts:

23    Defendants' argument is unavailing.  And then it goes on to

24    talk about the need for a disclosure for a treating physician.

25               To be clear, we would not elicit testimony beyond the

1  four corners of his report, so I know there is a caveat in here

2  that disclosure would not be required unless the opinion -- the

3  doctor's opinion testimony extends beyond the facts disclosed

4  during care and treatment.  We have no intention of doing that.

5  It would just be with regard to the four corners of his report.

6          THE COURT:  I see the language that you're pointing

7  to.

8          Again, I would note that the first part of this says

9  that this doctor in this case would not be required to submit a

10  report.  So, again, it's talking about the report requirement.

11          As to disclosure, in my mind, that turns on the nature

12  of the testimony.

13          So plaintiff's motion as to Dr. Lequerica is denied,

14  to the extent they are seeking to preclude Dr. Lequerica from

15  testifying at all, because there are certainly some things that

16  he would be able to testify about as a fact witness that do not

17  raise scientific or technical expertise that would be

18  implemented by the third prong of Rule 701.  This is the rule

19  that says that lay witnesses can, in certain circumstances,

20  express opinions on things.  They are allowed to, except where

21  it is scientific, technical, or other expertise.  Then you go

22  to Rule 702.  Rule 702 then takes you into Rule 26 and requires

23  disclosure.  That's how it usually works, right.

24          So he can testify about some things.  I saw Mr. Rivera

25  at this time.  He looked like this.  I told him this.  Things

1    like that nature would not be opinion testimony.  So that, I

2    think, is clear.

3          What is not clear to me at this point is whether he

4    would be able to express opinions about Mr. Rivera's condition,

5    whether or not they are expressed in his report, which would be

6    hearsay.  So that is the only question that I have.  And I

7    don't know that they are resolved by these cases that I'm

8    seeing.  That's the only outstanding issue.

9          Mr. Paris, what is your reaction to these cases that

10   defendants have cited?  I see what they say.  They can

11   certainly be read consistently with the defendants' argument.

12         MR. BECKERMAN:  Can I add one more point?

13         THE COURT:  Sure.

14         MR. BECKERMAN:  That there was a Rule 26 disclosure

15   from the plaintiffs identifying Dr. Lequerica and the fact that

16   they would rely on his treatment in proving their claims.  I

17   don't know how surprise could be claimed or prejudiced.  They

18   disclosed him and gave us an authorization for the records,

19   which would suggest it was a treating doctor.

20         MR. PARIS:  Your Honor, as to that last point first,

21   if I may, surprise is claimed because in the preparation of the

22   final throes of discovery in this matter, when we were dealing

23   with experts, on December 19, 2022, defendant disclosed four

24   medical experts.  On January 13, 2023, about a month later, the

25   Dr. Lequerica report and authorization were provided to

1  defendants.  A month after that, in February, on February 17,

2  2023, plaintiff disclosed his expert witnesses, and then the

3  deadline for expert discovery was extended at the request of

4  both parties from March 20 to March 31, 2023; and, in fact, on

5  March 31, 2023, defendant did serve some additional expert

6  disclosures of three rebuttal experts.

7          None of the expert disclosures that I have just

8  discussed were for Dr. Lequerica.  We had no basis until the

9  date that we were going through the joint pretrial order

10  together and witnesses were listed, which was December 21,

11  2023, right on the eve of trial, which the Court is reminded

12  the trial date was originally set for January 29.  So about

13  five weeks before trial is the first time that we had any

14  inkling that anybody, ourselves or defense counsel, intended on

15  calling Dr. Lequerica to the stand.

16          Moreover, your Honor, I see your point that

17  Dr. Lequerica, as a fact witness, can testify as to facts just

18  as any other lay person can and what he did and subject to

19  hearsay, etc., what he was told.

20          But the cases that govern what type of witness he is,

21  which has nothing to do whether he's a treating witness or not,

22  indicate that whether a treating physician is considered an

23  expert subject to expert disclosure requirements depends, and

24  I'm quoting, not on his title as a treating physician, but upon

25  the nature of the testimony that the physician intends to

1    provide at trial.  We also cited to case law that says --

2              THE COURT:  I don't disagree with you about that.  My

3    understanding of the substantive distinction is that if a

4    treating physician is explaining what treatment he provided in

5    connection with that, there may be conclusions that he came up,

6    right.  I understand that you are suffering from X disorder or

7    I'm telling you that you are suffering from this disorder, so I

8    am going to give you this treatment.  In that context, you

9    wouldn't have an objection to that kind of testimony, right?

10             MR. PARIS:  In the hypothetical, no, your Honor,

11   because it's something he told the person, and it's his

12   knowledge that's not a scientific or other expertise's

13   knowledge.  But that's not the case here.  Dr. Lequerica did

14   not treat the plaintiff.  Dr. Lequerica is being sought to come

15   in and talk about testing that he gave the plaintiff,

16   neuropsychological testing which requires expertise in

17   scientific knowledge to interpret.

18             THE COURT:  What did he do with this report once he

19   was done with it?

20             MR. PARIS:  Sent it to Paradigm.

21             THE COURT:  That was used to facilitate the treatment

22   of Mr. Rivera.

23             MR. PARIS:  That was used for other people to decide

24   what treatment he should receive as part of his course of care.

25             THE COURT:  Whether it's indirect or direct, this was

1    part of a treatment program.  It may be that Dr. Lequerica did

2    not himself provide treatment, but his report was then used by

3    another physician or agency to determine course of treatment.

4          MR. PARIS:  Your Honor, I understand, and I would go

5    on to say that even if Dr. Lequerica were to be considered, for

6    the sake of argument, a treating physician, he is still -- if

7    they are seeking to introduce his testing and analysis of the

8    test results, his findings, the things that he requires his

9    graduate-level medical training to interpret is subject to the

10   Federal Rules as to expert disclosure.  Still, as I sit here

11   right now on January 17, 2024, there has not been an expert

12   disclosure.  Notably, these motions *in limine* were filed.

13   There was no attempt by defense counsel.

14         THE COURT:  There has been an expert disclosure.  You

15   have the name and you have the report.  As I understand

16   Mr. Beckerman, he is not going to testify about anything else

17   other than what's in the four corners, that he said, of that

18   document, which you have.  They don't need on a full-on report.

19   That much is clear.  They don't need a full-on report because

20   they have not retained Dr. Lequerica.  So he is not being

21   retained for testimony in this proceeding.  So he doesn't need

22   a report.

23         The only question is whether a disclosure was

24   required.  When were you in possession -- have you always had

25   that diagnosis form from Dr. Lequerica?

1          MR. PARIS:  The only thing that we have from

2    Dr. Lequerica, your Honor, is his six-page report that is of

3    the one time that he saw.

4          THE COURT:  That's all he is going to testify about.

5    That's all that I am going to let him testify about.

6          MR. PARIS:  Your Honor, I understand, and I heard you

7    when you said your ruling is that the overall motion to

8    preclude is denied.  Now we are getting into the substance of

9    what he can testify to.

10          In looking at the report, your Honor, where it starts

11    with testing and results on page 3, and goes on to the end of

12    his report, all of that requires his medical expertise, and we,

13    again, were given no indication until the joint pretrial order

14    that anybody was going to be calling him as a witness to offer

15    that testimony to the jury, and therein lies the import of my

16    argument.

17          Even assuming he is a treating physician for the sake

18    of argument, an obligation lies upon a party who wishes to call

19    somebody as an expert at the time of trial.  They need to be

20    designated --

21          THE COURT:  What's the prejudice?  Because

22    Mr. Beckerman is saying that you yourself were aware of

23    Dr. Lequerica from the outset of this case maybe.  You had put

24    him on your Rule 26 disclosures, whether you use that testimony

25    or not.  Once the defendants bring him into the picture, you

1    are already in possession -- you know exactly what

2    Dr. Lequerica was going to say, so there is no prejudice to

3    bringing him in.  Was there any prejudice to the plaintiff

4    here?

5             MR. PARIS:  Yeah.  He wasn't disclosed as a Rule 26

6    expert, your Honor, not by us.

7             THE COURT:  Mr. Beckerman.

8             MR. BECKERMAN:  He was part of their Rule 26

9    disclosure, and they gave us an authorization to obtain those

10   records.

11            MR. PARIS:  The Rule 26 disclosure that listed the

12   names --

13            THE COURT:  I understand.  You knew about it.  Let's

14   get down to brass tacks.  You knew about him and there wasn't

15   some new disclosure.  If they had, for instance, sent you with

16   a JPTO, a new report from Dr. Lequerica with other stuff, he

17   would be out.  There would be no question.

18            But what they are saying is, we are just going to ask

19   him questions within the scope of his previously produced

20   report.  If that's all they are doing, then there is no

21   prejudice from the late disclosure, if there was a disclosure

22   requirement.

23            The reason why I'm getting into this is because

24   Mr. Beckerman is correct that in some of these cases they seem

25   to indicate that a treating physician is permitted to testify

 1    as a fact witness.  It is not considered to be an expert

 2    witness, where there is just an explanation of treatment and

 3    whatever opinions were furnished in connection with that

 4    explanation of treatment.  That would take this out of Rule

 5    26(a)'s requirements all together.  That's what he's saying.

 6            I'm saying, even if it fell into that Rule

 7    26(b)(2)(C), where a disclosure was required, you kind of had

 8    everything.  It's hard for me as a discovery sanction to say

 9    that Dr. Lequerica would not be permitted to testify.

10            So here is what I am going to do.  I am going to deny

11    the motion as to Dr. Lequerica.  I would urge and warn the

12    defendants that if they are asking Dr. Lequerica questions, it

13    better be limited to the four corners of that report.

14            Mr. Paris, keep looking at the cases.  If there is

15    something that really indicates that a disclosure would be

16    required here, I'll allow you to renew your motion *in limine*.

17            When is Dr. Lequerica going to testify among the 26

18    witnesses in this case?  He is not like the first witness,

19    right?

20            MR. BECKERMAN:  He will not be the first witness.

21            THE COURT:  If we need to, we will have time to get

22    into this, but right now I am going to deny the application.

23            MR. PARIS:  Your Honor, before you move on, just so

24    that the record is complete, there is another aspect to the

25    application and that's the nature of cumulative testimony.

```
 1              This is now affording the defendant the opportunity to
 2    call in two doctors of the same specialty, two doctors who
 3    conducted the same tests, two doctors who, as best as I can
 4    tell from my analysis of the report side by side, although they
 5    use different wording, come to much the same result of
 6    Dr. Lequerica and Dr. DiBenedetto.  There are, admittedly, some
 7    differences between the two conclusions, findings --
 8              THE COURT:  I am not going to grant the motion on
 9    cumulative testimony grounds, but I am going to impose a clock
10    on both sides.  So there is no way you are going to get through
11    all those witnesses with the clock that I'm going to impose,
12    and I don't think you need all these witnesses.
13              It may turn out that the defendants decide that it's
14    not in everybody's interests to call Dr. Lequerica because they
15    have some other witness who could fill the same role, right?
16    If they decide to do it, they are going to take time off the
17    clock for presenting other witnesses or doing
18    cross-examination.
19              One question.  Mr. Beckerman, have you produced any
20    and all communications with Dr. Lequerica to the plaintiff?
21              MR. BECKERMAN:  There is no written communications.
22              Go ahead, please.
23              I wasn't involved.
24              MR. KIM:  There was email communication with regards
25    to service of the subpoena, so we can definitely send that over
```

1   to plaintiff's counsel today.

2          MR. PARIS:  Your Honor, with apologies to Mr. Kim and

3   Mr. Beckerman, unless somebody went to the doctor's house with

4   a printer and a laptop or to his office and sat with him, there

5   was obviously communication almost certainly via email for his

6   declaration.

7          MR. BECKERMAN:  That's a fair point.  If there were

8   emails back and forth, we will turn those over to Mr. Paris.

9   There had to have been, I guess, just to send him the

10  declaration.  If there were, we will certainly turn those over.

11         THE COURT:  Everything needs to be turned over and,

12  Mr. Paris, I am not saying that's OK if they turn those over at

13  this point.  I understand that when you get these documents,

14  you may have a different discovery issue to raise with the

15  Court.

16         MR. PARIS:  Thank you, your Honor.

17         THE COURT:  Let's go to defendants' motions.

18         The first one is defendants' motion relating to the

19  regulation sub (b)(1)(iii).  That's 23.1.7(b)(1)(iii).  This

20  motion is granted as unopposed.

21         Anything further on that from either side?

22         MR. PARIS:  No, your Honor.

23         THE COURT:  Then we have the defendants' motion on Mr.

24  Rivera testifying.

25         Mr. Paris, do you have any concerns about Mr. Rivera's

1    competency to testify at this trial?

2            MR. PARIS:  No, your Honor.

3            THE COURT:  Mr. Beckerman, is it your position that

4    Mr. Rivera is not competent to testify?

5            MR. BECKERMAN:  I think it's Dr. Busichio's position.

6            THE COURT:  Is it your position?

7            MR. BECKERMAN:  We are taking the position that the

8    plaintiff should be estopped from presenting two opposing

9    things to the same jury when it benefits them on a particular

10   argument or given moment.  In the first instance --

11           THE COURT:  That wasn't my question.  I'll let you get

12   there.

13           First question.  You agree that Mr. Rivera is

14   competent to testify, right?

15           MR. BECKERMAN:  I think our position in the case is he

16   has no traumatic brain injury at all.

17           THE COURT:  I take that as a yes, he is competent to

18   testify.

19           MR. BECKERMAN:  Yes.

20           THE COURT:  If both sides agree that Mr. Rivera is

21   competent to testify, then he is going to be permitted to

22   testify.

23           The question you're really asking is whether the

24   plaintiff should be permitted to put on expert testimony that

25   would be inconsistent with that position, that he is competent

1    to testify.  Is that fair?

2          MR. BECKERMAN:  Yes.  If they are going to agree that

3    he's competent to testify and put him on the stand, then I

4    don't think they should also be able to put in testimony that

5    says his memory is such that he would test in the very lowest

6    position of anybody in the general public.  How can they both

7    call him and then present evidence to the same jury that he's

8    testing in the 1 percentile on memory, the most important part

9    of what you need in order to testify about events over the last

10   three years.

11         THE COURT:  First of all, I don't know what testimony

12   the plaintiff is going to put on either from Mr. Rivera or from

13   the expert because we haven't had trial yet.  So this is an

14   application that you can definitely call a sidebar about if you

15   feel something is coming in that would raise this

16   inconsistency.

17         But I'll say a few things.

18         First of all, as I understand it, the expert initially

19   made a determination that Mr. Rivera was in these very low

20   percentiles, but gave further testimony that, due to treatment

21   and his general improvement, he was increasing in all of those

22   categories.

23         MR. BECKERMAN:  I would disagree with that.  If I can

24   interrupt.  I apologize for interrupting.  Because on memory --

25   and this was not discussed in Dr. Busichio's affidavit.  She

1  left that out of her declaration.  On the first testing he was

2  in the 18th percentile on memory.  On the second testing he

3  went down to the first percentile.

4       While in other areas he did improve, which she pointed

5  out to the Court, she conveniently never commented on the fact

6  that his memory got worse from February 2023 to September 2023.

7  And as of September 2023, which is the last results I have, he

8  is testing in the 1 percentile.

9       THE COURT:  Those are cognitive assessments that do

10  not map on directly to the competency requirement, which means

11  that -- that's why this application is strange, because usually

12  if you are attacking the competency of the plaintiff, then you

13  would attack it.  But you're not attacking it.  You're saying

14  he's actually fine.

15       Your real beef is with evidence you think is going in

16  that is undermined by the fact that Mr. Rivera is testifying.

17  The normal way that that would work is that you would have a

18  field day on cross-examination of the plaintiff's expert for

19  making exactly the points that you are making.

20       But you are asking me to actually exclude, without

21  ever hearing from these witnesses, this expert's testimony.

22  It's not really excluding Mr. Rivera from testifying, because

23  you agree that he's competent.  You are saying exclude the

24  expert who is going to present evidence of a cognitive

25  assessment that would be inconsistent with Mr. Rivera's

1    aptitude to testify at this trial.  There is no basis in law to

2    do that kind of thing, so I am going to deny the application.

3          However, if something happens during trial that you

4    think is beyond the pale in terms of what the expert is saying

5    about Mr. Rivera's aptitude, then I'll entertain an application

6    there.  But I would think that from a trial strategy

7    perspective, you would prefer to have Mr. Rivera competently

8    and cogently testify as to what occurred on the date in

9    question.  Then when the expert comes up to try to say that he

10   just has no memory and everything else, that you would attack

11   that witness' credibility in the way that you described in the

12   application.

13         But I don't think there is any legal basis for me to

14   exclude either Mr. Rivera or the expert on these grounds, so I

15   am going to deny the defendants' motion as to Mr. Rivera

16   testifying.

17         That takes care of the motions *in limine*.

18         And pause there.  Are there any issues on either side

19   to address with respect to the motions?

20         MR. PARIS:  No, your Honor.

21         THE COURT:  Mr. Beckerman.

22         MR. BECKERMAN:  I have nothing else.

23         THE COURT:  That takes care of the motions.

24         We will take a little breather to talk about time for

25   trial.

1          My intent is to give each side 20 hours for openings,

2    examinations, closings.  That's 40 total hours.  If we stick to

3    that, and we will stick to that, then we should be able to try

4    this within the parties' proposed timeline, which I think is

5    eight to ten days, which in this case is nine days.  We are

6    going to start Tuesday, go through Friday, and we will have the

7    following week.  I think we should be able to do it.  I don't

8    see why we wouldn't be able to.

9          Mr. Paris or Mr. Beckerman, whoever wants to speak to

10   it, if there is any issue with that, but that is a lot of time

11   per side.

12         MR. PARIS:  I just want to point out to the Court,

13   your Honor, that that's not actually an equal amount of time

14   because four of the plaintiff's experts -- four of the

15   plaintiff's witnesses are testifying with the assistance of a

16   Spanish interpreter.  As the Court is undoubtedly aware, you

17   don't get the same amount of question and answer in a

18   one-hour-long period when there is an interpreter as opposed to

19   when there is not an interpreter.

20         These are witnesses that we are putting on.  These are

21   witnesses that are important, as they are fact witnesses.  Two

22   of those are liability and damages witnesses.  Excuse me.  One

23   of those is a liability and damages witness in the plaintiff

24   himself.  The other one is a damages witness in the plaintiff's

25   wife.

1          By contrast, while four of the defendants' witnesses

2     require a Spanish interpreter, an equal number, they are only

3     liability and none of them are the plaintiff.  The plaintiff,

4     obviously, is the person who, in most cases, including this

5     one, has the most to say, requires the most time, and this

6     plaintiff is through a Spanish interpreter.

7          MR. BECKERMAN:  I also have to cross-examine that same

8     witness through a Spanish interpreter, which comes off of my

9     clock.

10          MR. PARIS:  I'm just it pointing out to the Court.

11          THE COURT:  I understand.

12          We are going to stick with the 20 hours.  Just like in

13     *FIFA*, the Court reserves the right to provide either side with

14     some stoppage time if necessary.

15          MR. BECKERMAN:  The only issue I have with the eight

16     to ten days, your Honor, and I did raise this last time we were

17     here when we selected the trial date, I'm traveling that next

18     Thursday, February 8, to the following Monday.  I did bring

19     that up when we selected the trial dates.  The Court had said

20     this will be a five-day trial and it won't be an issue.  If we

21     are extending into that next week, I do have travel plans.

22          THE COURT:  Just give me a second here.

23          Understood.  What we will do is, we are going to try

24     to get it in before you take off on the 8th.  If the case is

25     given to the jury on the 7th, then we don't have an issue,

 1   right, if Mr. Kim is here, if there are questions from the

 2   jury, or anything along those lines?

 3           MR. BECKERMAN:  I could conference in if there were

 4   questions from the jury.

 5           THE COURT:  Sure.  If there are any questions, I would

 6   certainly relieve you of having lead trial counsel here, but we

 7   should be able to handle it.

 8           Would you be handling closings?

 9           MR. BECKERMAN:  Yes.

10           THE COURT:  We are going to try to get it in.

11           Thank you for reminding me about that.  I do remember

12   that those issues has been raised initially.

13           MR. BECKERMAN:  I appreciate the courtesy.  Thank you.

14           THE COURT:  Let's go to exhibits.

15           Before we do that, we have been here for over an hour.

16   Anybody need a break?

17           Let's take five minutes, and we will come back.

18           (Recess)

19           MR. BECKERMAN:  Your Honor, before we get to the

20   objections, can I ask one clarifying question.  Is industrial

21   code Section 23.1.7(b) completely out of the case?  That has

22   been fully --

23           THE COURT:  This must be the fifth time that I have

24   had to go over this.

25           Let me just now walk through and understand what the

1    sequence of events is here.

2            There was a motion for summary judgment, and at that

3    time the plaintiff was only asserting a violation of

4    23.1.7(b)(1)(i), correct?

5            MR. BECKERMAN:  Yes.

6            THE COURT:  The Court granted the motion for summary

7    judgment as to that subdivision standing alone.

8            Now, it does not stand alone.  There are other

9    subdivisions, right, which is what the Court pointed out.  And

10   noting that no argument had been made as to the other

11   subsections, the Court had identified subsection (iii) as being

12   one that remained in the case, as I understand it.

13           So I granted the motion as to (b)(1)(i) standing

14   alone.  That was out.  But to the extent that there was a

15   viable claim as to (iii), that was still in the case.

16           Now the plaintiff has indicated they are not pursuing

17   that subsection in their response to the motion *in limine*.  So

18   if I'm understanding everything correctly, then (b)(1) is out

19   of the case.

20           MR. BECKERMAN:  Thank you.

21           THE COURT:  The only further statement I give is

22   that -- and I believe this was consistent with the motion for

23   summary judgment hearing, is that there was actually no

24   argument made from the plaintiff as to how they could sustain a

25   claim under (b)(1)(i) based on the language and the text of

1    that subdivision, which I believe required, in the case of a

2    hazardous opening, either a closed opening or a guardrail

3    around the opening.  And I believe I almost have a photographic

4    memory of my questioning of plaintiff's counsel.  Is there any

5    argument that there is not a guardrail in compliance with this

6    part?  And there was none.  So there would be no way for me to

7    permit that claim standing alone to move forward.

8         Now I think I have clarified this, hopefully, for the

9    last time.

10        MR. BECKERMAN:  I appreciate it.  Thank you.

11        Before we start with the objections, if we can reserve

12   time at the end and the Court will indulge us, I think there is

13   some interest in having a settlement discussion.  I think both

14   parties have that interest.  I don't know if time can be

15   reserved -- we can continue with the objections and everything

16   else and resolve what we can, but if there is some time that

17   can be reserved for that, I would appreciate it.

18        THE COURT:  Of course.  It's the most important thing

19   here.

20        Let's do some logistics.  Let's see if it's profitable

21   to talk about these objections here, and then we can talk about

22   settlement.

23        First of all, as to logistics, is there any issue if

24   we were to do one of two things?  One, we could select our jury

25   the week before the commencement of trial.  I'm thinking, let's

 1   say we did it on the 24, 25th, or 26th, and then commence trial

 2   on January 29.  That will ensure that trial can be complete

 3   before your vacation.  I do recall that you alerted the Court

 4   as to that.

 5          First of all, any issues with that?  Because I think

 6   there is a chance, at least, that we may be able to do that.

 7   If we do, it's going to be just better for everyone because we

 8   are going to be able to get through this in a more -- in a

 9   faster way.  We will be able to make sure that we don't have to

10   hold things over.

11          The worst thing probably for everyone is if we get to

12   the 7th and then we have to take two dark days and then come

13   back on the 12th.  I don't think anyone wants to do that.  I am

14   trying to avoid that outcome.

15          Mr. Paris, do you have any issues with that?

16          MR. PARIS:  The problem I have with that, your Honor,

17   is, in anticipation of trial on the 30th, once the Court moved

18   it from the 29th to the 30th, I moved some things on other

19   matters to the week before.  And I have -- I'm looking at the

20   calendar.  It's a scary looking calendar.  I know that there

21   are -- there is not a single day that week where I don't have

22   something that requires me personally.  I can try to clear up

23   one of those days, if I can, but I wasn't anticipating having

24   to do so.

25          THE COURT:  I understand.  Let us check with the jury

1    office here to see if there is something that we could do.

2    Then I am going to ask you to try, to the extent you can, to

3    move some of those things around because I just don't think

4    it's in anyone's best interests -- you are not going to have an

5    attentive jury if you run into a situation where they have to

6    go dark for two days and come back.  You are just going to lose

7    something, I think.  I think it's preferable to get it all

8    done.

9              There are some other things that we can do on our end

10   to make sure that we finish up on time, but I just want to make

11   sure that I can balance getting this done on schedule with

12   allowing both sides to be able to do what they need to do

13   during trial.  Stay tuned.  We will inform the parties about

14   that.

15             MR. PARIS:  I am going to wait until I hear back from

16   the Court until --

17             THE COURT:  We are going to work on this immediately.

18   I think that to the extent that there is an option that we have

19   available, we will let the parties know this week.

20             MR. BECKERMAN:  I could be available the 26th, if that

21   works, your Honor.  That's the Friday.

22             THE COURT:  I am just trying to see if they have

23   venires that come in on the Friday.  That's the only question

24   we have to consult.  We will let the parties know.  I

25   appreciate everyone's willingness to do this.

1          If we need to have dark days, it's fine.  It happens

2     in a lot of trials, and we will do it.  I'd like to get it done

3     in one go, if we can.

4          As to the exhibit and deposition objections, in the

5     interest of time, are there categories or sort of themes that I

6     could give you guidance on that would help you then resolve the

7     remaining exhibits, or are there really important objections

8     that you would like me to look at here?  Because I think what

9     probably makes sense is not to go through every single

10    objection but to rather see what I can give you in terms of

11    guidance on rulings, and then the parties have done a good job

12    so far resolving issues among them.

13         Mr. Paris, do you have a thought on that?  Or we can

14    do it the old-fashioned way.

15         MR. PARIS:  I think, your Honor -- I know we just took

16    a brief recess, but in light of the rulings that you have given

17    us and the guidelines for trial that you have given us, if you

18    give counsel a few minutes to confer off the record, we might

19    be able to clear up some, if not most, of the evidentiary

20    objections to the evidence and the depositions.

21         THE COURT:  OK.  Let's take how much time, five

22    minutes, ten minutes?

23         MR. BECKERMAN:  Some of the rulings are also going to

24    affect the jury charge.  That's going to take a little bit

25    longer.

1          THE COURT:  We are not getting into the jury charge

2     here today.

3          MR. BECKERMAN:  I didn't know that.

4          THE COURT:  The way that's going to work is that we

5     will take a look at both sides' proposed jury charges.  If

6     there are amendments in light of today, you can submit those to

7     the Court.  We will then send you a proposed revised jury

8     charge, and then we will have a charge conference, and we will

9     figure out what the charge is going to be, and we will do that

10    at some point during the trial, I think, under these

11    circumstances.  That's how that's going to work.

12         The only thing we really need to get done with today

13    are any exhibit objections.  Even deposition objections, in my

14    experience, the parties always just work those out because the

15    objections, if there is a hearsay objection, you will just

16    truncate the testimony.  You are not going to have enough time

17    to have someone read back this testimony.  I don't know if it

18    was videotaped or not.  If it was not, you are going to have to

19    have someone sit here and read it.  You probably don't want to

20    do that from a tactical matter, just to secure the jurors'

21    attention.

22         Really, I am looking at the exhibit objections and

23    seeing if we can just resolve those.  Do you want to take ten

24    minutes to see if you can finish that up?

25         MR. PARIS:  That would be great.  Thank you.

 1              THE COURT:  Let's take minutes.  We will see you at

 2    2:45.

 3              (Recess)

 4              THE COURT:  Have we resolved anything?

 5              MR. PARIS:  Your Honor, thank you for the time.  We

 6    resolved all of the evidence objections.  We have agreed that

 7    for any deposition objections except one that Mr. Beckerman

 8    might want to raise with you now, because it also involves a

 9    witness who is going to be testifying live, that in the event

10    that either of us intend on utilizing any portion of deposition

11    transcript for any reason that's been flagged as objected to,

12    we will bring it up to the Court at that time.

13              But given that the time restraints that you have

14    imposed and the fact that testimony can be elicited from live

15    witnesses where a transcript might only be required for

16    impeachment purposes, which may not need to happen if they

17    answer consistently with what's in their transcript, many of

18    the -- and there were only a handful of deposition objections

19    left, your Honor.  It seems that all except potentially one

20    have been rendered moot, and I am going to allow Mr. Beckerman

21    to address that, as he indicated he wished to.

22              MR. BECKERMAN:  We had objected to Jose Cabrera, who

23    will be testifying live, to any testimony about his prior

24    conviction.  He had testified at his deposition that he had

25    been convicted of what, in his words, they put it down as

1    attempted possession of a weapon.  I don't think that has any

2    probative value to this jury.  It's not a fraud conviction.  It

3    is not a burglary, something of dishonesty.  It's a weapon

4    possession, and I don't see how that would go to any probative

5    value of a lay witness.  And before we have the problem in

6    front of the jury, I would just rather address it now.  I had

7    flagged that in his testimony as an objection, but I would

8    anticipate that since he is testifying live, he might be asked,

9    have you ever been convicted of a crime?  I think it's just

10   better to deal with that now than try to unring that bell with

11   the jury.

12           THE COURT:  Mr. Paris.

13           MR. PARIS:  Yes, your Honor.

14           I believe that it is proper questioning to ask a

15   witness if they have been convicted of a crime and, if they

16   have been convicted of a crime, to have them indicate what it

17   was.

18           The jury in both of our requests to charge is going to

19   be hearing testimony -- hearing the charge on *falsus in uno*,

20   and if the jury finds that someone has willfully testified

21   falsely to a material fact that they can disregard all of his

22   testimony.  If Mr. Cabrera testifies at trial the way that I

23   anticipate him testifying at trial, he will be offering

24   testimony that is contradicted by every single other witness in

25   this trial, and I believe his criminal past has a bearing on

1   his credibility.

2       MR. BECKERMAN:  I think those credibility issues are

3   certainly fodder for cross-examination, but I don't understand

4   how *falsus in uno* has anything to do with a prior criminal

5   conviction.

6       THE COURT:  I didn't get that.  You're saying that

7   while it may be true, under Rule 404, that you could bring in

8   evidence of, for instance, a conviction for fraud, to undermine

9   this witness' credibility, a possession of a weapon charge or a

10  conviction or arrest is not relevant to the credibility of the

11  witness.

12      MR. BECKERMAN:  It's not a crime of dishonesty.

13      THE COURT:  I would agree with that.

14      You're not wrong, Mr. Paris, that under certain

15  circumstances you would be able to bring in other evidence of

16  other crimes, wrongs or acts in order to undermine the

17  credibility of this witness.  You'd have to explain to me how

18  this would fit into Rule 404.  Rule 404(b) says:  Prohibited

19  uses:  Evidence of any other crime, wrong, or act is not

20  admissible to prove a person's character in order to show that

21  on a particular occasion the person acted in accordance with

22  the character.  There are some exceptions, but I am not seeing

23  how this would fit into those exceptions.

24      Do you have an argument as to how, given the nature --

25  it's really given the nature of the conviction how that would

1    undermine his credible.

2            MR. PARIS:  I understand, your Honor.  I concede that

3    it is not what he apparently -- his words, your Honor, were,

4    they put it down as attempted possession of a weapon.  At this

5    point I have -- that reads to me like he pled guilty to

6    something.  I have no knowledge whatsoever right now as to what

7    he was charged with or what originally was alleged before he

8    pled it down.  In the event that we find between now and

9    Mr. Cabrera taking the stand that it is the type of crime that

10   fits into 404(a), we will revisit the issue.  But I would agree

11   that it is not something that is -- as it stands, with

12   attempted criminal possession of a weapon, it seems to be

13   encapsulated in 404(b).  I agree with that.

14           Based on your Honor bringing that to our attention, we

15   will -- if it's your ruling that we are not to ask him about a

16   criminal conviction unless we are able to ascertain that it's

17   proper character evidence --

18           THE COURT:  What I'll say now is that, based on what

19   I've been told, that would be excluded.  But you can

20   certainly -- once you get to that point in questioning this

21   witness, you can certainly bring it up, and you should also

22   look at Rule 609 in connection with that.  If you have an

23   application beforehand, if you say that we have actually looked

24   at this and we should be allowed to ask about this based on

25   these rules of evidence, then you can bring that application to

1    the Court.

2          MR. PARIS:  Thank you, your Honor.

3          THE COURT:  Anything else with respect to depositions?

4          MR. PARIS:  No, your Honor.  As we said, we don't

5    anticipate it coming up, but if it does, we will address it at

6    the time.

7          THE COURT:  Having been the person who has been awake

8    at 2:00 in the morning putting together deposition

9    designations, I am confident that most, if not all, of these

10   objections will be resolved before we get to trial.

11         That takes care of the objections.

12         Anything else before we get to the issue of

13   settlement, Mr. Paris?

14         MR. PARIS:  No.

15         There does remain issues regarding the verdict sheet

16   and proposed jury charge.  We are, your Honor, just so you

17   know, trying to work out, in accordance with your prior

18   directives, as much as we can amongst ourselves.  We have

19   started that with the verdict sheet, and we will be moving on

20   to the instructions, which we have also started but not

21   finished.

22         THE COURT:  Understood.

23         Where are we in terms of settlement?  How can I be of

24   help to the parties?  I'm happy to have an off-the-record

25   conversation.

1          Let me take a step back.  This is a jury trial, so I

2    can help you out.  I understood from the statements made before

3    that both sides would maybe appreciate some help.  I'm happy to

4    do that in whatever form would be beneficial.

5          We don't have the clients here in the courtroom today,

6    right?

7          MR. PARIS:  No.  De Gabriel Rivera is not here but is

8    available for us to speak to.

9          MR. RONAI:  We have authority, your Honor.

10          MR. BECKERMAN:  I do have my principals here.  I have

11    my client and I have the carrier with the applicable layer that

12    we are in here to discuss.

13          THE COURT:  Would you like to do it here off the

14    record?

15          MR. BECKERMAN:  I think it might be most productive if

16    we could break out individually with you, if the plaintiffs are

17    comfortable with that, to facilitate the conversation that way.

18          THE COURT:  What I'll ask is, we have a couple of

19    minutes.  The parties should discuss this between them.  If

20    both sides have no objection to that kind of *ex parte*

21    discussion, then I am happy to do it.  Don't tell me if one

22    side or the other has an objection.  Whoever can be the

23    spokesperson can just say, the parties talked and we would

24    actually prefer a different approach.  Then if nobody has an

25    objection, I will be happy to do that.

 1              Do you want to take a few minutes?  Let's come back at

 2    3:00.  You can have that discussion and then I'll come back.

 3              MR. BECKERMAN:  Thank you, your Honor.

 4              (Recess)

 5              THE COURT:  We are back on the record.  Who wants to

 6    be the spokesperson?

 7              MR. KIM:  I will, your Honor.

 8              We have consent to partake in the settlement

 9    discussions, as discussed.

10              THE COURT:  Let me see the plaintiff and counsel.

11    Plaintiff is not here.  Just plaintiff's counsel.  Let's go in

12    the robing room.

13              Just to confirm on the record, the parties consent to

14    the Court having *ex parte* communications related to settlement

15    only with the parties.  Those will be off the record.  Agreed?

16              MR. RONAI:  I was the dissenting opinion.

17              THE COURT:  Aside from the joking statement from

18    cocounsel, I believe we have no objection from either side, so

19    let's proceed.

20              (Adjourned)

21

22

23

24

25